WISCONSIN LABEL CORPORATION, Plaintiff-Appellant-Petitioner,

v.

NORTHBROOK PROPERTY & CASUALTY INSURANCE COMPANY, Defendant-Respondent.

Supreme Court

*No. 98–0194. Oral argument January 5, 2000.—Decided March 21, 2000.*

2000 WI 26

(Also reported in 607 N.W.2d 276.)

For the plaintiff-appellant-petitioner, there were briefs by *George Burnett* and *Liebmann, Conway,*

*Olejniczak & Jerry, S.C.*, Green Bay, and oral argument by *George Burnett*.

For the defendant-respondent there was a brief by *Susan R. Tyndall* and *Hinshaw & Culbertson*, Milwaukee, and oral argument by *Susan R. Tyndall*.

¶ 1. JON P. WILCOX, J. Wisconsin Label Corporation (Wisconsin Label) petitions this court for review of a published decision of the court of appeals, *Wisconsin Label Corp. v. Northbrook Property & Casualty Insurance Co.*, 221 Wis. 2d 800, 586 N.W.2d 29 (Ct. App. 1998). The court of appeals affirmed a decision of the Circuit Court for Kewaunee County, Dennis J. Mleziva, Judge, granting summary judgment in favor of Northbrook Property & Casualty Insurance Company (Northbrook).

¶ 2. The case arose because a company owned by Wisconsin Label allegedly failed to properly label products. For the purposes of this summary judgment motion, the parties stipulate that products were mislabeled and that the mislabeling caused the products to be sold at less than half of their intended retail price. After the distributor of the products was forced to pay the retailer for the resulting losses, the distributor sought reimbursement and offset invoices for the completed work against the amount due for reimbursement.

¶ 3. Wisconsin Label notified its insurer, Northbrook, of its intention to seek indemnification for its losses under its commercial general liability insurance policy. Northbrook informed Wisconsin Label that the policy did not provide coverage because no "property damage" had occurred as that term is defined in the policy.

¶ 4. After Northbrook denied coverage, Wisconsin Label sued, alleging that Northbrook was in breach of the policy. Northbrook filed a motion for summary and declaratory judgment. The circuit court granted Northbrook's motion, holding that Northbrook had no duty to defend or indemnify Wisconsin Label for losses arising out of the mislabeling. The court of appeals affirmed, and Wisconsin Label petitions for review.

¶ 5. Because we conclude that no "property damage" occurred as that term is defined in Wisconsin Label's insurance policy, we affirm the decision of the court of appeals.

## BACKGROUND

¶ 6. For purposes of the summary judgment motion, the parties stipulated to the following facts. Wisconsin Label acquired the assets and operations of Ameripac Corporation (Ameripac), an Illinois corporation. Subsequent to Wisconsin Label's acquisition of Ameripac, Northbrook issued an insurance policy ("the Policy") to Ameripac in Illinois. The Policy provided coverage from October 1, 1992 until October 1, 1993.

¶ 7. In October 1992 Ameripac contracted with Personal Products Company (PPC) to assemble two separate PPC products into a single promotional package for retail sale. Under the promotion, PPC wanted to allow consumers who bought a box of "Stay Free Maxi-Pads" to receive a box of "Care Free Panty-Shields" at no extra charge. Accordingly, Ameripac was supposed to (1) package the two separate products into a single promotional package, and (2) cover all of the existing UPC bar codes and replace them with new UPC labels reflecting the price of the "Stay Free Maxi-Pads."

¶ 8.   Ameripac wrapped and labeled over 350,000 promotional packages, and PPC distributed the packages to various Wal-Mart stores for retail sale. After sales began, Wal-Mart claimed that Ameripac had failed to completely cover the old UPC labels on a number of the packages. As a result, Wal-Mart claimed that its registers had scanned many packages at the lower " Care Free Panty-Shields" price of $1.16, rather than the "Stay Free Maxi-Pads" price of $2.47. Wal-Mart asked PPC to reimburse it for lost profits that resulted from this undercharging and for the costs of relabeling the remaining packages. PPC paid Wal-Mart approximately $200,000 in compensation for these losses.

¶ 9.   After PPC paid Wal-Mart for its losses, PPC in turn asked Ameripac for reimbursement. In addition to the $200,000 it had paid to Wal-Mart, PPC asked for $25,000 in reimbursement for costs that PPC incurred in reinspecting the unsold packages. PPC offset Ameripac's invoices, which totaled approximately $125,000, against PPC's claim for reimbursement. Although PPC has withheld payment on Ameripac's invoices, it has not yet sued to recover the balance.

¶ 10.   Wisconsin Label[1] seeks insurance coverage for its losses due to the mislabeling under the Policy. Wisconsin Label argues that the following insuring clauses of the Policy provide coverage:

---

[1] We assume for purposes of our analysis that Wisconsin Label and Ameripac may be treated as a single entity. Although Northbrook's answer to Wisconsin Label's complaint specifically denies that the Policy applies to Wisconsin Label Corporation, Northbrook did not raise this issue in its motion for summary and declaratory judgment or in its arguments before this court.

## SECTION 1—COVERAGES

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. Insuring Agreement

    a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. . . .

    b. This insurance applies to any bodily injury and property damage only if:

        1. The bodily injury or property damage is caused by an occurrence that takes place in the coverage territory; and

        2. The bodily injury or property damage occurs during the policy period.

The Policy defines "property damage" as:

    a. Physical injury to tangible property, including all resulting loss of use of that property . . .; or

    b. Loss of use of tangible property that is not physically injured. . . .

Wisconsin Label asked Northbrook to indemnify it for the losses that resulted from the mislabeling, arguing that the losses were sums it had become legally obligated to pay "as damages because of. . .property damage," according to the definition of "property damage" in the Policy.

321

¶ 11. Northbrook rejected Wisconsin Label's claim for indemnification because it concluded that Wisconsin Label's losses are not the result of "property damage" as that term is defined in the Policy. Northbrook argued that no "property damage" occurred under either part of the Policy definition because (1) the mislabeling did not constitute "physical injury to tangible property," and (2) there was no "loss of use of tangible property that is not physically injured."

¶ 12. Furthermore, even if property damage did occur, Northbrook argued that the "impaired property exclusion" precluded any coverage. The impaired property exclusion denies coverage for:

> m. Property damage to impaired property or property that has not been physically injured, arising out of:
>
> > (1) A defect, deficiency, inadequacy or dangerous condition in your product or your work; or
> >
> > (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

"Impaired property" is defined as:

> [T]angible property, other than your product or your work that cannot be used or is less useful because:
>
> > a. It incorporates your product or your work that is known or thought to be defective, deficient, inadequate or dangerous, or

b.    Any Insured has failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a.    The repair, replacement, adjustment or removal of your product or your work; or

b.    Your fulfilling the terms of the contract or agreement.

The impaired property exclusion is subject to one exception; it does not exclude coverage for "the loss of use of other property arising out of sudden and accidental physical injury to your product or your work after it has been put to its intended use." Because it concluded that the Policy provided no coverage, and that in any case the impaired property exclusion would preclude coverage, Northbrook declined to indemnify Ameripac for its losses.

¶ 13.    Wisconsin Label sued Northbrook, claiming that Northbrook had breached the Policy by failing to investigate the claim and by failing to pay for the claim. Wisconsin Label sought compensatory damages for this alleged breach of the Policy. Northbrook filed a motion for summary and declaratory judgment, seeking judgment in favor of Northbrook as a matter of law and a declaration that Northbrook has no obligation to indemnify Wisconsin Label for the loss at issue.

¶ 14.    The circuit court granted Northbrook's motion for summary judgment. The court first analyzed whether the Policy provided coverage for the loss. The court determined that the Policy did not extend coverage because no "property damage" had occurred under either part of the definition. Under the first part of the definition, the court concluded that no "physical injury to tangible property" had occurred. Under the

second part of the definition, the court determined that the mislabeling did not give rise to any "loss of use," but only to economic loss, and that the type of economic loss created by the mislabeling was not covered by the Policy. The court also rejected Wisconsin Label's argument that the diminished value of the products constituted property damage, because the mislabeling did not diminish the physical usefulness of the products. Thus, the court concluded that no coverage existed under the coverage provisions of the Policy.

¶ 15. In addition, the circuit court concluded that even if Wisconsin Label's losses were due to "property damage," the impaired property exclusion precluded any coverage. The court explained that the packages were "impaired property" under the Policy definition because they could be restored to use by repair or replacement of the labels. Wisconsin Label argued that the packages that were sold at the wrong price were not "impaired property" because they could no longer be repaired or replaced. The court rejected this argument, because the definition of "impaired property" requires only that the products "can be restored to use," not that they actually be restored to use. Since the products could have been restored to full use by replacement of the labels before they were sold, they were impaired property. Finally, the court also rejected the argument that the exception to the impaired property exclusion applied, because the injury to the packages was not sudden or accidental and did not take place after the product was put to its intended use.

¶ 16. Wisconsin Label appealed. In its review, the court of appeals first considered Wisconsin Label's arguments that its losses were due to "property damage" because they resulted from "physical injury to tangible property." Wisconsin Label argued that physi-

cal injury occurred because the mislabeling diminished the value of Wal-Mart and PPC's property and because the packages " 'required physical measures to repair.' " *Wisconsin Label*, 221 Wis. 2d at 808.

¶ 17.    The court of appeals concluded that the mislabeling did not cause any physical injury to the products or the packaging. *Id.* at 809. The court explained that the economic losses that resulted from the mislabeling are not property damage within the "physical injury" part of the property damage definition in the Policy. *Id.* The court also rejected Wisconsin Label's argument that physical injury had occurred under the test set forth in *Eljer Manufacturing, Inc. v. Liberty Mutual Insurance Co.*, 972 F.2d 805 (7th Cir. 1992). The court of appeals distinguished *Eljer* because that case involved defective plumbing systems that had been installed in houses, whereas "the labels were not defective in and of themselves, so there was no incorporation of a 'defective work or component.' " *Wisconsin Label*, 221 Wis. 2d at 810. Moreover, there was no possibility that physical injury would occur in the future because the only injury that the mislabeling could ever cause was lost profits. *Id.*

¶ 18.    The court of appeals also rejected Wisconsin Label's argument that physical injury to property occurred because the mislabeling diminished the value of Wal-Mart and PPC's property. *Id.* at 811. The court reasoned that Wisconsin Label must be relying on language in the first part of the definition that defines property damage as physical injury to property including the loss of use of that property. *Id.* The court explained that under *Ehlers v. Johnson*, 164 Wis. 2d 560, 564, 476 N.W.2d 291 (Ct. App. 1991), this language "defines property damage to include loss of use as a result of physical damage." *Wisconsin Label*, 221

Wis. 2d at 811. In Wisconsin Label's case, because there was no physical damage, there could be no loss of use as a result of physical damage. *Id.* at 811–12.

¶ 19.  Having concluded that no "property damage" occurred under the first part of the definition, the court of appeals next turned to Wisconsin Label's argument that property damage occurred under the second part of the definition, "[l]oss of use of tangible property that is not physically injured." The court stated that under *Sola Basic Industries, Inc. v. United States Fidelity & Guaranty Co.*, 90 Wis. 2d 641, 644, 280 N.W.2d 211 (1979), this part of the definition applies if property is diminished in value or made useless. The court found that the products were still useable and therefore were not rendered useless by the mislabeling. *Wisconsin Label*, 221 Wis. 2d at 814. The court also found that the products were not diminished in value because the mislabeling did not change the character of the products but merely caused lost profits. *Id.* at 815.

¶ 20.  Thus, the court of appeals determined that the Policy did not provide coverage because no property damage had occurred under either part of the definition of property damage. Having determined that no coverage existed, the court did not need to address the issue of whether the impaired property exclusion precluded coverage. *Id.* at 816.

¶ 21.  Wisconsin Label petitioned this court for review of the court of appeals' decision. Like the circuit court and the court of appeals, we conclude that Wisconsin Label's losses were not the result of "property damage" as that term is defined in the Policy. We therefore affirm.

## STANDARD OF REVIEW

¶ 22.   Insurers often move for summary judgment to raise the issue of whether an insurance policy covers a particular injury, damage, or liability. *Jones v. Sears Roebuck & Co.*, 80 Wis. 2d 321, 325, 259 N.W.2d 70 (1977). When reviewing a circuit court's decision to grant summary judgment, we apply the same methodology as the circuit court. *Smith v. Katz*, 226 Wis. 2d 798, 805, 595 N.W.2d 345 (1999). The applicable methodology is set forth in Wis. Stat. § 802.08(2):

> The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .

The parties have stipulated to the facts in this case, and they present no issues of material fact. Instead, whether the summary judgment motion was properly granted depends upon interpretation of an insurance contract. Interpretation of an insurance contract presents a question of law that this court reviews *de novo*. *Smith v. Katz*, 226 Wis. 2d at 805.

## ANALYSIS[2]

¶ 23.   Insurance policies are contracts and are governed by the same rules that govern interpretation

---

[2] Northbrook contends that Illinois law governs this case. Def.-Resp't's Br. at 12–13 n.1. However, Northbrook acknowledges that Wisconsin and Illinois law are not in conflict about the issue presented. *Id.*; *Wisconsin Label*, 221 Wis. 2d at 807

of contracts in general. *Id.* at 806; *Kremers-Urban Co. v. American Employers Ins. Co.*, 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). The primary goal in interpreting a contract is to determine and give effect to the parties' intention. *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998); *Kremers-Urban*, 119 Wis. 2d at 735. When the language of a contract is unambiguous, we apply its literal meaning. *Gorton*, 217 Wis. 2d at 506. However, if contractual language may reasonably be construed to have more than one meaning, the contract is ambiguous. *Id.*

¶ 24.  Whether a contract is ambiguous is a question of law. *Id.* Any ambiguity that does exist will be interpreted against the drafter, especially when the contract is a standard form supplied by the drafting party. *Id.* On the other hand, if the language of the policy is not ambiguous, "we will not engage in construction, but will merely apply the policy terms." *Kremers-Urban*, 119 Wis. 2d at 736.

¶ 25.  When the contract at issue is an insurance policy, we are guided by the principle that the words of the policy should be given the meaning that a reasonable person in the position of the insured would have given them. *Id.* at 735. However, we must not rewrite an insurance policy so as to provide coverage for a risk that the insurer did not contemplate and for which it has not been paid. *Smith*, 226 Wis. 2d at 807.

n.2. The first step in resolving a choice of law issue is determining whether the laws of the two states differ. *Sharp v. Case Corp.*, 227 Wis. 2d 1, 10–11, 595 N.W.2d 380 (1999). If they are the same, the law of the forum state applies. *Id.* at 11. Because there is no genuine difference between the two laws in this case, we apply Wisconsin law.

¶ 26.  The coverage dispute in this case arises in a somewhat atypical manner. Coverage disputes usually arise when an insured is sued by a third party and focus on whether the insurer has a "duty to defend" the insured in the lawsuit. *See, e.g., id.* at 806–07; *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 266, 593 Wis. 2d 445 (1999). Here, the parties stipulate that PPC has not yet sued Wisconsin Label for reimbursement, and Wisconsin Label does not specifically argue that Northbrook has breached a duty to defend. Of course, there remains a risk that PPC will decide to sue Wisconsin Label at some future date. Because Northbrook's motion asks for a summary and declaratory judgment against Wisconsin Label's claim for indemnification, we must resolve any doubt as to whether the Policy provides coverage in favor of Wisconsin Label. *See Wausau Tile*, 226 Wis. 2d at 266.

¶ 27.  With these principles in mind, we now turn to the question of whether the Policy provides coverage for Wisconsin Label's losses. The Policy is a standard commercial general liability or "CGL" policy.[3] A CGL policy protects the insured against liability for dam-

---

[3] Standard CGL policies were first developed and promulgated by insurance industry trade organizations in 1940 and were periodically revised during the succeeding decades. Laurie Vasichek, Note, *Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy*, 68 Minn. L. Rev. 795, 798–99 & n.14 (1984). Today, most CGL insurance in the United States is written on standardized forms promulgated by the Insurance Services Office, Inc. (ISO). *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 772 (1993). The Policy is a standard CGL policy that provides coverage when an "occurrence" causes "damages" during the policy period. *See* Stempel, *Law of Insurance Contract Disputes* § 14.01, § 14.02.

ages the insured's negligence causes to third parties. *General Casualty Co. v. Hills*, 209 Wis. 2d 167, 172–73 n.9, 561 N.W.2d 718 (1997). More specifically:

> The risk intended to be insured [in a CGL policy] is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Bulen v. West Best Mutual Insurance Co.*, 125 Wis. 2d 259, 264–65, 371 N.W.2d 392 (Ct. App. 1985) (quoting *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 791 (N.J. 1979).

¶ 28. Under the Policy, Northbrook promises to "pay those sums that the Insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies." None of the damages in this case resulted from bodily injury. Therefore, whether coverage exists depends solely upon whether Wisconsin Label has become legally obligated to pay "damages because of. . .property damage." The Policy defines "property damage" to mean (1) "[p]hysical injury to tangible prop-

erty, including all resulting loss of use of that property," or (2) "[l]oss of use of tangible property that is not physically injured."

¶ 29. Combining the language of the insuring agreement with the language defining "property damage," the Policy provides coverage for sums that Wisconsin Label has become legally obligated to pay as damages because of. . .(1) physical injury to tangible property, including all resulting loss of use of that property, or (2) loss of use of tangible property that is not physically injured.

¶ 30. We begin by considering whether, under the first part of this definition, Wisconsin Label has become obligated to pay damages because of "physical injury to tangible property, including all resulting loss of use of that property."

¶ 31. We agree with the court of appeals' determination that this definition is unambiguous and that no physical injury to tangible property occurred in this case. *Wisconsin Label*, 221 Wis. 2d at 808–09. Language in an insurance contract is interpreted according to its common and ordinary meaning. *Kremers-Urban*, 119 Wis. 2d at 735. Although the term "injury," standing alone, may refer broadly to both physical and nonphysical types of damage, when it is qualified by the word "physical," its meaning is limited to physical damage. Thus, as the court of appeals pointed out, the phrase "physical injury" ordinarily refers to some sort of physical damage. *Wisconsin Label*, 221 Wis. 2d at 809.

¶ 32. No physical damage occurred in this case. The products were improperly labeled, but both the products themselves and the packaging remained physically undamaged at all times. The lack of physical

331

damage is demonstrated by the fact that the products were sold to customers with the improper labeling. Labeling could conceivably result in physical injury to tangible property, if, for instance, a caustic adhesive burned through the packaging and actually injured the product. However, no such physical damage occurred here.

¶ 33. Wisconsin Label contends that any reasonable insurer would conclude that the products were physically injured because they required "physical repair." However, the only "repair" that was required was to inspect and relabel the packages to ensure that they would always scan at the correct price. This inspection and relabeling was necessary to remedy Wisconsin Label's defective workmanship, not to repair any physical injury to the products. Thus, the economic losses that resulted were not due to "physical injury" to PPC's product but due to Wisconsin Label's failure to complete the work it promised to do under the contract. CGL policies do not provide coverage for the insured's liability for repairing or replacing the insured's defective work; they provide coverage for the insured's liability for physical injury to, or loss of use of, another's property. *See Bulen*, 125 Wis. 2d at 264–65. No reasonable insured would conclude that PPC's undamaged, saleable products suffered "physical injury" simply because Wisconsin Label improperly placed the labels on the packages.

¶ 34. Wisconsin Label also argues that under *Eljer Manufacturing*, physical injury occurred because its defective work was incorporated into another's product and had to be replaced in order to prevent a future loss from materializing. *See Eljer*, 972 F.2d at 810, 814. *Eljer* involved leaky plumbing systems that

were installed in hundreds of thousands of United States residences. *Id.* at 807. Thousands of tort claims were filed and approximately five percent of the systems were deemed likely to eventually result in lawsuits. *Id.* The insurer involved in the particular suits at issue in *Eljer* contended that coverage for such claims was not triggered until a system actually leaked, causing damage to the rest of the residence. *Id.* at 808. The Seventh Circuit determined that, to the contrary, "physical injury" had occurred whenever a defective system was installed into a residence, because the probability that the system would fail was high enough "to induce a rational owner to replace it before it fails." *Id.* at 812. The court concluded, "incorporation of a defective product into another product inflicts physical injury in the relevant sense on the latter at the moment of incorporation." *Id.* at 814.

¶ 35. Wisconsin Label argues that, like in *Eljer*, physical injury occurred when Wisconsin Label incorporated defective work, i.e., misplaced labels, into PP C's products.

¶ 36. We find *Eljer* to be factually distinguishable from the case at hand. Unlike the plumbing systems, the labels were not "defective components." More importantly, even if putting the labels in the wrong place constituted "defective work," this defect could never be expected to cause "physical injury." The mislabeling left the products themselves physically unharmed. If left on the packages, the only injury that the labels could ever cause would be lost profit, when the product sold for less than its intended price. Thus, the labels in no sense posed the sort of latent danger that was at issue in *Eljer. See id.* at 807 (explaining that a leaky plumbing system "is like a time bomb

placed in an airplane luggage compartment: harmless until it explodes").

¶ 37.  Wisconsin Label next contends that we should find coverage because the mislabeling caused a "diminution in value" of the PPC products. It is unclear whether Wisconsin Label contends that this "diminution in value" is covered under the "physical injury" portion or the "loss of use" portion of the "property damage" definition. The court in *Eljer* interpreted the "physical injury" part of the definition to include diminution in value that resulted from physical incorporation of one product into another. *See Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 718 N.E.2d 1032, 1040–41 (Ill. Ct. App. 1999)(rejecting *Eljer*'s reasoning), *appeal allowed by* 723 N.E.2d 1170 (Ill. 1999). In *Sola Basic*, under an earlier definition of "property damage," this court held that a CGL policy covered losses that measured the diminution in the value of a manufacturing plant that resulted from the removal of a malfunctioning transformer. *Sola Basic*, 90 Wis. 2d at 654.

¶ 38.  Because we have already determined that the PPC products were not physically injured, the "physical injury" prong of the definition of "property damage" cannot extend coverage under a "diminution in value" theory. PPC's products were not physically injured, so they were not "diminished in value" due to physical injury.

¶ 39.  However, Wisconsin Label contends that even in the absence of physical injury, PPC's products suffered a "diminution in value" when they were sold at the incorrect, lower price. We must examine whether the Policy provides coverage for this "diminution in value" in the absence of physical injury.

¶ 40. The idea that diminution in value consti-tutes property damage, even in the absence of physical injury or loss of use, made sense under the definition of "property damage" that was at issue in *Sola Basic*. The court in *Sola Basic* interpreted the 1966 standard CGL policy, which provided a "misleadingly simple" defini-tion of property damage: "injury to or destruction of tangible property." *Sola Basic*, 90 Wis. 2d at 647.

¶ 41. *Sola Basic* applied this definition in the context of an insured's liability for rendering its cus-tomer's manufacturing plant partially unusable. Sola Basic Industries sold its customer a defective trans-former and then negligently damaged the transformer while attempting to repair it. *Id.* at 644. Consequently, the transformer had to be removed from the manufac-turing plant and completely rebuilt. *Id.* While the transformer was out for repairs, the manufacturer could not use its electric furnaces and was forced to incur additional costs to continue its operations by other methods. *Id.* Sola Basic paid for the removal and repair of the transformer at its own expense, but the manufacturer made an additional claim for damages resulting from the loss of use of its electric furnaces. *Id.* Sola Basic tendered this claim to its insurer under its CGL policy. *Id.* at 644–45.

¶ 42. In analyzing whether the CGL policy pro-vided coverage, this court first took note of comments by insurance industry trade organizations, which explained that the definition of property damage in the 1966 standard form purposely omitted any require-ment of "physical injury" to tangible property. *Id.* at 647–48 (citations omitted). Instead, the 1966 definition was designed to cover non-physical injury to tangible property that did not sustain physical damage but was nonetheless rendered useless by the insured's negli-

gence. *Id.* at 647. For example, if a large piece of equipment broke down in the street, limiting access to stores, the damages sustained by the stores due to the resulting loss of use of the stores would be covered by the policy. *Id.*

¶ 43. The *Sola Basic* court then considered precedent from several other jurisdictions interpreting similar definitions of "property damage" in CGL policies. *See id.* at 648–653. In *Hauenstein v. St. Paul-Mercury Indemnity Co.*, 65 N.W.2d 122 (Minn. 1954), the Minnesota Supreme Court interpreted a CGL policy to cover the diminished market value of a building that resulted from the application of defective plaster, because " 'the presence of the defective plaster on the walls and ceilings reduced the value of the building and constituted property damage.' " *Sola Basic*, 90 Wis. 2d at 648 (quoting *Hauenstein*, 65 N.W.2d at 358). Similarly, and in express reliance on *Hauenstein*, the California Supreme Court held that property damage to homes in the form of the diminished market value that resulted from the installation of defective aluminum doors was covered by the standard CGL policy. *Geddes & Smith, Inc. v. St. Paul-Mercury Indemnity Co.*, 334 P.2d 881, 885 (Cal. 1959). Also, in *Pittway Corp. v. American Motorists Insurance Co.*, 370 N.E.2d 1271 (Ill. Ct. App. 1977), an Illinois court held that the inclusion of defective valves in hairspray cans, which forced the hairspray distributor to scrap the entire product, constituted property damage. *Sola Basic*, 90 Wis. 2d at 652–53 (citing *Pittway*, 370 N.E.2d at 1274).

¶ 44. Having examined these and other precedents, this court derived four basic principles pertaining to CGL policies:

1) The exclusions [in CGL policies] eliminate coverage for injury to or destruction of the product furnished or work completed by the insured;

2) if the defect in the product furnished or work completed of the named insured causes damage to other tangible property, there is coverage for such damage to other property;

3) the term "property damage" to tangible property does not necessarily require physical damage;

4) tangible property may be damaged in that it is diminished in value or made useless, irrespective of actual physical injury to the tangible property.

*Sola Basic*, 90 Wis. 2d at 653–54. Guided by these principles, the court concluded that costs of removing and replacing the transformer and costs of continuing operations due to the loss of the electric furnace were covered under the CGL policy. *Id.* at 654. The court explained that "[t]hese costs do not represent lost profits, but are a measure of the diminution to the value of the plant caused by the malfunctioning transformer." *Id.*

¶ 45. *Sola Basic*'s holding must be read in context. The case "was decided a decade before this court first adopted the economic loss doctrine in *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis. 2d 910, 921, 437 N.W.2d 213 (1989)." *Wausau Tile*, 226 Wis. 2d at 268 n.19. The economic loss doctrine "precludes a purchaser of a product from employing negligence or strict liability theories to recover from the product's manufacturer loss which is solely economic." *Id.* at 245–46. The doctrine preserves the fundamental distinction between tort law and contract law and protects the parties' freedom to allocate eco-

nomic risk by contract. *Id.* at 247. In *Wausau Tile*, having determined that a purchaser's claims for negligence and strict liability were precluded by the economic loss doctrine, this court held that an insurer had no duty to defend against those claims under a CGL policy like the one in this case. *Id.* at 267–69.

¶ 46.   Moreover, *Sola Basic* was interpreting the 1966 definition of "property damage," which omitted any requirement that an injury be "physical" in order to trigger coverage. As *Hauenstein* held, the broad 1966 definition therefore could encompass "diminution in value" of tangible property, even without any physical injury. *Hauenstein*, 65 N.W.2d at 126.

¶ 47.   The 1966 policy form was standard in the insurance industry until a new form was promulgated in 1973. Vasicheck, 68 Minn. L. Rev. at 798–99. The post–1973 forms define "property damage" much more specifically than the 1966 form. The first part of the 1973 definition explicitly requires "physical" injury; the second part requires "loss of use" of tangible property that is not physically injured. Unlike the 1966 definition, neither part of the later definition is broad enough to encompass mere "diminution of value" of a product in the absence of physical injury or loss of use. Recognizing this crucial difference, the Minnesota Supreme Court concluded that *Hauenstein*'s reasoning did not apply to the newer definition of "property damage," and that diminution in value caused by incorporation of a defective component therefore is not "property damage" under post–1973 CGL policies. *Federated Mutual Insurance Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 756 (Minn. 1985). Under the same reasoning, the Illinois Court of Appeals explicitly rejected *Eljer*'s holding and concluded that the post–1973 definition of "property damage" does encom-

pass diminution in value that is unrelated to physical damage. *Travelers Insurance*, 718 N.E.2d at 1040–41 (holding that *Eljer* ignored the plain meaning of the phrase "physical injury" when it interpreted the policy to provide coverage for the intangible diminution in value that resulted from installation of leaky pipes). *See also Wyoming Sawmills, Inc. v. Transportation Insurance Co.*, 578 P.2d 1253, 1256 (Or. 1978)(holding that the inclusion of the word "physical" in the definition of property damage "negates any possibility that the policy was intended to include 'consequential or intangible damage,' such as depreciation in value"); Vasichek, 68 Minn. L. Rev. at 821 ("Although lost use of tangible property continues to be covered under the 1973 'property damage' definition, diminution in value of tangible property does not.")

¶ 48.   We agree with these courts that diminution in value caused by incorporation of a defective product does not constitute "property damage" under post–1973 policies unless it is the result of "physical injury" or "loss of use." Any suggestion in *Sola Basic* that CGL policies provide coverage for diminution in value that is not caused by physical injury or loss of use is inconsistent with the definition of "property damage" in post–1973 policies. We therefore conclude that the Policy provides no coverage for diminution in value in the absence of physical injury or loss of use.

¶ 49.   Having determined that the Policy does not provide coverage for "diminution in value" in the absence of physical injury or loss of use, and that the damages in this case did not result from physical injury, we now examine whether the damages resulted from "loss of use."

¶ 50. The "loss of use" prong of the Policy's definition of "property damage" provides coverage for damages that Wisconsin Label has become obligated to pay because of "loss of use of tangible property that is not physically injured." Under *Sola Basic*, "property damage" occurs when the property of a third party is "rendered useless" due to the insured's actions. *Sola Basic*, 90 Wis. 2d at 654. Wisconsin Label asserts that a loss of use occurred because Wal-Mart was forced to remove the PPC products from its shelves and delay sale while the products were relabeled.

¶ 51. However, Wisconsin Label has not actually become liable to pay any damages relating to the delay in sale of the PPC products. PPC paid Wal-Mart $200,000 in compensation for lost profits on packages that were sold at the wrong price and costs of relabeling unsold packages. PPC seeks reimbursement for this $200,000 and for an additional $25,000 in costs of reinspecting the packages. Thus, PPC's $25,000 in inspection costs, as well as some portion of the $200,000 paid to Wal-Mart, relate to inspecting and relabeling the packages, while the rest of the damages relate to lost profits that resulted from undercharging. Neither portion of the damages relates to the loss of use of the products during the time that they were being relabeled. This is to be contrasted with *Sola Basic*, where the damages related to the manufacturer's loss of use of its electric furnace while the defective transformer was being repaired.

¶ 52. Wisconsin Label also cites *American Motorists Insurance Co. v. Trane Co.*, 718 F.2d 842 (7th Cir. 1983) in support of its contention that a loss of use occurred in this case. *Trane* held that an allegation that defective heat exchangers caused a manufacturer's plant to operate at less than "full capacity—i.e.,

some of each plant's usefulness was lost," constituted an allegation of property damage. *Id.* at 844. Thus, in *Trane*, as in *Sola Basic*, the damages resulted from loss of use of another's property, the manufacturing plant, caused by the insured's defective product. *Id.* In this case, in contrast, the damages did not result from loss of use of the PPC products caused by the mislabeling. The damages resulted from undercharging and from relabeling of the unsold products.

¶ 53.  Wisconsin Label also contends that under the reasoning of *Western Casualty & Surety Co. v. Budrus*, 112 Wis. 2d 348, 332 N.W.2d 837 (Ct. App. 1983), the damages in this case are because of loss of use. *Budrus* concerned mislabeled seed; because the seed was mislabeled, a farmer planted his field with the wrong crops. *Id.* at 350. The court of appeals affirmed the trial court's holding that the loss of use of a forty-acre field constituted property damage under the farmer's CGL policy. *Id.* at 352. Wisconsin Label contends that "[i]f mistagged seed resulting in lost profits from crop and production losses was property damage in *Budrus*, lost profits and other losses arising from mislabeled consumer hygiene products constitute property damage here." Br. of Pl.-Appellant at 32.

¶ 54.  Like *Sola Basic* and *Trane*, *Budrus* is distinguishable because it involved the loss of use of other property caused by the insured's negligence. After the farmer discovered that the seed he had planted was of the wrong type, it was too late to replant that season; thus, he lost use of his field for the entire season. *Id.* at 350. The situation is analogous to the example described by the insurance industry trade organization in *Sola Basic*, in which a broken piece of machinery blocks a street and prevents customers from using a

store. *See Sola Basic*, 90 Wis. 2d at 647–48. In the case at hand, in contrast, although Wal-Mart experienced some brief loss of use of its products while they were relabeled, it does not seek compensation for the loss of use of the products for that period of time. Instead, it seeks reimbursement for the profits it lost when products were sold at the wrong price and for the costs of relabeling. We conclude that Wisconsin Label has not become obligated to pay damages because of "loss of use of tangible property that is not physically injured."

¶ 55.  Wisconsin Label next argues that the Policy must provide coverage for its losses because "purely economic losses are covered under a CGL policy unless excluded in the policy's business risk exclusions because the policy affords coverage for damages arising from property damage." Br. of Pl.-Appellant at 34.

¶ 56.  We agree that, as a general proposition, CGL policies may sometimes cover economic losses. For instance, in *Sola Basic*, the CGL policy covered the economic losses the manufacturer sustained in order to continue operations. *Sola Basic*, 90 Wis. 2d at 654. Indeed, Northbrook itself "does not take the position that economic losses are never covered" by CGL policies. Def.-Resp't's Br. at 31.

¶ 57.  However, economic losses will be covered under a CGL policy only when the policy language creates coverage for such losses. In the Policy, coverage applies only when damages are because of "physical injury to tangible property" or "loss of use of tangible property." The economic losses in this case did not result from either of these types of damage. Therefore, there is no coverage.

¶ 58.   Instead of resulting from property damage, the damages in this case resulted from Wisconsin Label's failure to adequately perform its contract to label PPC's products. *See Wausau Tile*, 226 Wis. 2d at 266–68 (holding that a CGL policy did not provide coverage for damages that constituted economic loss and were not recoverable in tort). A CGL policy is not a performance bond; it provides coverage "for tort damages but not for economic loss resulting from contractual liability." *Jacob v. Russo Builders*, 224 Wis. 2d 436, 448, 592 N.W.2d 271 (Ct. App. 1999). Wisconsin Label's damages resulted from its contractual liability for its own defective workmanship, not from "physical injury" or "loss of use" that Wisconsin Label caused to PPC's property. The economic losses therefore were risks that Northbrook "did not contemplate and for which it has not been paid" under the explicit language of the Policy. *Smith*, 226 Wis. 2d at 807, (quoting *Qualman v. Bruckmoser*, 163 Wis. 2d 361, 365, 471 N.W.2d 282 (Ct. App. 1991)).

¶ 59.   In conclusion, we determine that the CGL policy that Northbrook issued to Ameripac provides no coverage for the losses that Ameripac and Wisconsin Label sustained due to the mislabeling. Because the Policy does not extend coverage for Wisconsin Label's losses, we need not examine whether the "impaired property exclusion" would preclude coverage. We affirm the decision of the court of appeals.

*By the Court.*—Affirmed.