COURT OF APPEALS
DECISION
DATED AND FILED

October 8, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1877**

Cir. Ct. No. **2021CV2939**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

FRANKENMUTH MUTUAL INSURANCE COMPANY,

PLAINTIFF-RESPONDENT,

V.

MIDWEST STAIRS & IRON, INC.,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: GWENDOLYN G. CONNOLLY, Judge. *Reversed and cause remanded for further proceedings*.

Before White, C.J., Geenen and Colón, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Midwest Stairs & Iron, Inc. appeals from an order of the circuit court declining to find coverage for a claim that Midwest made under its insurance policy with Frankenmuth Mutual Insurance Co. and granting judgment in favor of Frankenmuth finding that it did not have to defend or indemnify Midwest.  For the reasons set forth below, we conclude that, based on the record before us, Midwest's claim is covered under its insurance policy with Frankenmuth and no exclusions to that coverage apply.  Accordingly, we reverse the circuit court's order granting judgment in favor of Frankenmuth, and we remand for further proceedings consistent with this opinion.

## BACKGROUND

¶2     Midwest is a local steel, aluminum, and stainless steel metal fabricator serving the greater Midwest area.  In addition to several other products, Midwest fabricates an aluminum balcony, which includes a deck and railing, and is painted with a powder coated finish.  The powder coated finish applied to the balconies requires a multi-step paint application process.  Prior to 2019, Midwest had the balconies painted outside of its shop by a subcontractor.  However, by April 2019, Midwest moved the painting process to its shop, and Midwest chose a process designed and developed by Milport Enterprises, Neutral Solution, and Chemtec North America, LLC.  The painting process that Midwest began using in April 2019 used a chemical additive known as Ecophor B700 Plaforization.  This chemical additive is referred to shorthand simply as "plaf."  "Plaf is the product which helps the paint stick to the aluminum manufactured balconies."  Milport supplied the plaf for the painting process.

¶3     In March 2020, Midwest noticed that the paint in the powder coated finish on some of the aluminum balconies sitting in its shop was bubbling and

cracking, causing the paint to peel and flake off, and Midwest contacted Milport and Neutral Solution about fixing the problem. Midwest's president, Howard Wurgler, indicated that, in some instances the issue was bigger than a simple touch up paint job, and the paint was peeling off in "sheets" and "large chunks," which necessitated a complete replacement of the deck boards. Midwest's vice president, Tim McCaigue, provided a similar account at his deposition.

¶4      Following March 2020, Midwest received complaints—and in one instance even received a demand letter—from its customers about the paint peeling and cracking on balconies that had been installed at several different projects—consisting mainly of apartment buildings and senior living facilities—that had been completed during 2019 and earlier in 2020.[1] In some instances, Midwest handled the installation of the balconies at the project, and in others, Midwest had simply supplied the balconies and the installation was handled by someone else on the project. Ultimately, Midwest either repaired or, as in most cases, replaced hundreds of balconies at several properties, and it has continued to receive complaints from customers as late as December 2020 about peeling and flaking paint on balconies painted using the plaf from Milport.

¶5      During this same timeframe, Midwest continued to contact Milport and Neutral Solution for an answer to the paint adhesion problem.[2] Eventually,

---

[1] For purposes of its argument related to E&O coverage, Frankenmuth disputes that Midwest first became aware of the paint issue for the first time in March 2020 and instead posits that Midwest was aware of the issue by October 2019. However, as a result of our conclusion today, we need not resolve when Midwest first because aware of the paint issue.

[2] Wurgler explained that, during this timeframe, Milport and Neutral Solution were visiting its shop—"coming over a lot"—and were "heavily involved in trying to figure out" what the problem was and develop a solution for Midwest.

Midwest determined that Milport's plaf was causing the paint to peel and crack, and after Midwest eliminated Milport's plaf from the painting process and, in fact, implemented an entirely new process designed and developed by Chemetall in June 2020, Midwest stopped having issues with peeling and cracking paint in the powder coated finish on the balconies.[3]

¶6      Midwest had a Commercial Package Policy with Frankenmuth, effective January 1, 2020, to January 1, 2021. This policy included a Commercial General Liability Coverage policy (CGL policy), and a Business Errors and Omissions Liability Endorsement (E&O policy). Midwest applied for the E&O policy on June 3, 2020, and the policy was made retroactive to May 27, 2020. At the time that Midwest completed the application for the E&O policy, it answered "No" to the question, "Has any errors and omissions claim been made or is now pending against the above applicant?"

¶7      On July 9, 2020, Midwest submitted a claim (a Liability Loss Notice) to Frankenmuth under the insurance policy that Midwest had with Frankenmuth. Midwest described the loss as "[p]aint flaking off balconies; multiple locations in multiple states; possible $2 million in damage." Frankenmuth denied the claim. Midwest requested that Frankenmuth reconsider its denial of coverage, and Frankenmuth again denied Midwest's claim. However,

---

[3] McCaigue described that they "fired" Milport and "stopped using that whole process." He further described that they began using Chemetall, which involved a process that used all new chemicals, washes, and a different conversion.

4

Frankenmuth did agree to defend Midwest against any claims made by its customers against Midwest.[4]

¶8    Frankenmuth subsequently filed this declaratory judgment action and moved for summary judgment, asking for a declaration that it had no duty to defend or indemnify Midwest for any claims from customers arising from the peeling and cracking paint. Frankenmuth argued that neither the CGL policy nor the E&O policy covered Midwest's claim. In particular, Frankenmuth argued that there was no initial grant of coverage under the CGL policy and, alternatively, the business risk exclusions found in the CGL policy applied and barred coverage. Frankenmuth further argued that the prior acts provision and the known loss doctrine precluded coverage under the E&O policy.

¶9    Following briefing by the parties, the circuit court granted judgment in favor of Frankenmuth. The circuit court found that the paint and the balconies were an integrated system that could not be separated and found that there was no evidence of property damage "other than the bubbling and flaking of the paint itself," such that there was property damage arising out of an occurrence within the meaning of the CGL policy. Thus, the circuit court found that the CGL policy did not cover Midwest's claim, and the circuit court did not reach the issue of whether any exclusions to coverage applied. The circuit court then found that Midwest's claim was ultimately excluded from the E&O policy because of the prior acts provision.

---

[4] In its opposition to Frankenmuth's motion for summary judgment, Midwest argued that Frankenmuth breached its duty to defend Midwest. This argument has not been pursued on appeal, and we do not address it further.

¶10     Midwest appeals.  Additional relevant facts are included below as necessary.

## DISCUSSION

¶11     Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  WIS. STAT. § 802.08(2) (2021-22).[5]

¶12     We review a decision granting summary judgment "independently of the circuit court, benefiting from its analysis."  *Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶21, 241 Wis. 2d 804, 623 N.W.2d 751.  We apply the same methodology as the circuit court.  *Id.*  "Specifically, a court first examines the pleadings to determine whether a claim for relief is stated," and second, "whether a genuine issue of material fact is presented."  *Id.*  We draw all reasonable inferences "in the light most favorable to the non-moving party." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781.  "The purpose of the summary judgment procedure is to avoid trials when there is nothing to try."  *Tews v. NHI, LLC*, 2010 WI 137, ¶42, 330 Wis. 2d 389, 793 N.W.2d 860.

¶13     On appeal, Midwest argues that the circuit court erroneously granted summary judgment in favor of Frankenmuth and declared that Midwest's claim is

---

[5] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

not covered by the insurance policy that it had with Frankenmuth such that Frankenmuth has no current duty to defend or, potentially, a duty to indemnify Midwest as a result of the paint adhesion issues with the balconies. To that end, Midwest first argues that its insurance policy with Frankenmuth provides for an initial grant of coverage under the CGL policy and there are no exclusions from this coverage. Midwest then argues that the prior acts provision and known loss doctrine do not preclude coverage under the E&O policy. In the alternative, Midwest argues that factual disputes render summary judgment on Frankenmuth's duty to defend, and potentially indemnify, Midwest inappropriate.

¶14 We conclude that, based on the record before us, Midwest's claim is covered under the CGL policy and no exclusions to coverage under the CGL policy apply to bar coverage. Therefore, we further conclude that Frankenmuth has a duty to defend and, potentially, indemnify Midwest related to the paint adhesion issues with the balconies. Consequently, we do not address whether Midwest's claim is covered under the E&O policy. *See **State v. Blalock***, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").

## I. Legal Principles Governing Review of Insurance Policies

¶15 In reviewing whether Midwest's claim is covered by its insurance policy, "our task is to interpret and apply the language of the insurance policy." *5 Walworth, LLC v. Engerman Contracting, Inc.*, 2023 WI 51, ¶31, 408 Wis. 2d 39, 992 N.W.2d 31. We interpret an insurance policy "to determine and give effect to the intent of the contracting parties," and we construe insurance policies "as they would be understood by a reasonable person in the position of the insured." *American Fam. Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶23,

7

268 Wis. 2d 16, 673 N.W.2d 65. We give the language in an insurance policy its "common and ordinary meaning," and we construe any ambiguous language "in favor of coverage." *Danbeck v. American Fam. Mut. Ins. Co.*, 2001 WI 91, ¶10, 245 Wis. 2d 186, 629 N.W.2d 150.

¶16 We first examine "whether the policy's insuring agreement makes an initial grant of coverage." *American Girl, Inc.*, 268 Wis. 2d 16, ¶24. If it does, we next examine whether any exclusions preclude coverage. *Id.* "Exclusions are narrowly or strictly construed against the insurer if their effect is uncertain," and we "analyze each exclusion separately." *Id.* If an exclusion applies, we last examine whether any exceptions to the exclusions reinstate coverage. *Id.* "The insured bears the burden of showing an initial grant of coverage, and if that burden is met the burden shifts to the insurer to show that an exclusion nevertheless precludes coverage." *Day v. Allstate Indemnity Co.*, 2011 WI 24, ¶26, 332 Wis. 2d 571, 798 N.W.2d 199.

¶17 The interpretation of an insurance contract is a question of law that we review *de novo*. *American Girl, Inc.*, 268 Wis. 2d 16, ¶23.

## II. The Commercial General Liability Insurance Policy

¶18 A CGL policy is "a particular type of insurance contract that protect[s] 'the insured against liability for damages the insured's negligence causes to third parties.'" *5 Walworth, LLC*, 408 Wis. 2d 39, ¶15 (citation omitted). "The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." *Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶27, 233 Wis. 2d 314, 607 N.W.2d 276 (citation omitted). Typically, a CGL policy provides "a

broad statement of coverage, and insurers limit their exposure to risk through a series of specific exclusions." ***American Girl, Inc.***, 268 Wis. 2d 16, ¶28. With these principles in mind, we turn to the language of Midwest's CGL policy with Frankenmuth.

### A. Initial Grant of Coverage

¶19 The language of the initial grant of coverage in Midwest's CGL policy with Frankenmuth provides the typical grant of coverage, and it provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

Midwest's policy continues that the insurance applies to property damage "only if" the property damage is "caused by an 'occurrence.'"

¶20 Similar to the standard CGL policy language, Midwest's policy defines property damage as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." The policy also defines occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶21 While "accident" is not a defined term in the policy, "Wisconsin courts have interpreted identical policy language many times," and "[g]enerally, an 'accident' is 'an event or condition occurring by chance or arising from

9

unknown or remote causes,' or 'an event which takes place without one's foresight or expectation.'" *5 Walworth, LLC*, 408 Wis. 2d 39, ¶34 (citation omitted).

¶22    We conclude that, under the plain meaning of the policy language, there is property damage resulting from an occurrence. As Midwest contends, the balconies (the tangible property) have suffered bubbling, cracking, and peeling paint in their powder coated finish, which has caused both damage to other property and an inability of the balconies to be used for their intended purpose (the physical injury). Midwest's customers have voiced concerns over the safety of the balconies as a result of the paint failures related primarily to possible slipping hazards with the underlying aluminum exposed. Midwest is further aware of at least one customer complaint involving the flaking paint needing to be cleaned off the adjoining building and nearby vehicles, and yet another customer threatened to hold Midwest responsible for lost rents as a result of the delay caused in the construction project while waiting for the balconies to be repaired and installed. Taken together, these satisfy the requirement of physical injury to tangible property because the balconies themselves were physically injured, surrounding property was injured, and the balconies suffered a loss of use for their intended purpose. Therefore, based on the facts before us, Midwest's claim clearly meets the definition of property damage within the meaning of the policy such that Frankenmuth has a duty to defend and possibly indemnify Midwest.

¶23    Furthermore, the adhesion issues and failures in the paint caused by the defective plaf cannot be considered anything but accidental because the failures in the paint were not expected, and thus, Midwest's claim also plainly qualifies as an occurrence. *See id.*, ¶45 (explaining that a defective product can cause an accident).

¶24    Relying on ***Wisconsin Pharmacal Co., LLC v. Nebraska Cultures of California, Inc.***, 2016 WI 14, 367 Wis. 2d 221, 876 N.W.2d 72, Frankenmuth argued, and the circuit court found, that the integrated system analysis applied in in determining whether there is an initial grant of coverage under the CGL policy. In other words, Frankenmuth argued and the circuit court found that there was no initial grant of coverage under the CGL policy because the balcony and paint were an integrated system such that the only damage that occurred was to the product itself. *See **Wausau Tile, Inc. v. County Concrete Corp.***, 226 Wis. 2d 235, 249-50, 593 N.W.2d 445 (1999) (explaining the integrated system analysis as "[w]hen the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself" (citation omitted)).

¶25    Since the time of the circuit court's decision and initial briefing in this appeal, our supreme court issued its decision in ***5 Walworth, LLC v. Engerman Contracting, Inc.***, 2023 WI 51, 408 Wis. 2d 39, 992 N.W.2d 31, and the parties have each supplemented their briefing in response to our supreme court's decision and the application of the integrated system analysis following that decision.

¶26    In ***5 Walworth***, our supreme court stated:

> [W]e overrule ***Pharmacal***'s holding incorporating the integrated systems analysis into insurance policy disputes. We further reject and overrule its incorporation of an "other property" analysis into the initial determination of whether an occurrence has caused "property damage" under an insurance policy. The proper approach is the one we laid out in ***American Girl*** and multiple other cases: our task is to interpret and apply the language of the insurance policy. In doing so, we follow the three-step process we outlined above. We first examine if the policy makes an initial grant of coverage, then analyze if any exclusions preclude coverage, and finally, review if any exceptions to a particular exclusion reinstate coverage.

11

*Id.*, ¶31 (footnote and citations omitted). Thus, our supreme court reaffirmed our focus is on the language of the policy and rejected that there is any "other property" requirement in determining whether property damage occurred when evaluating the initial grant of coverage. In other words, the property damage used to trigger an initial grant of coverage within the meaning of a CGL policy can be property damage to the insured's product itself. *See also **American Girl, Inc.***, 268 Wis. 2d 16, ¶47 (explaining that the "business risk exclusions" would be "entirely unnecessary" if damage to the insured's own work or product could never trigger coverage in the first place).

¶27 Consequently, despite the focus placed on the integrated system analysis by the parties and the circuit court below and initially on appeal, we follow our supreme court's lead in *5 Walworth* and decline to apply the integrated systems analysis in determining whether there is an initial grant of coverage in this case. Rather, as our supreme court instructed in *5 Walworth*, "our task in insurance coverage disputes is to read the policy and give effect to the parties' agreement." *Id.*, 408 Wis. 2d 39, ¶3. Therefore, for our purposes in determining whether there is property damage triggering an initial grant of coverage, our analysis is strictly limited to the policy language.

¶28 Returning to the language of the insurance policy, we first note that there is clearly no requirement of property damage to "other property" when determining if there is an initial grant of coverage under Midwest's CGL policy. As previously stated, the policy defines property damage as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." Under an analysis that begins and ends with the definition contained in the policy, all that is required is

tangible property, and without foreclosing the possibility of damage to other property, we note that the balconies themselves meet that requirement.

¶29    Consequently, we conclude that Midwest is clearly entitled to an initial grant of coverage.  Thus, having established an initial grant of coverage, we turn to the business risk exclusions and determine whether any of these exclusions to the initial grant of coverage applies to bar coverage for Midwest's claims.

### B. The Business Risk Exclusions

¶30    Midwest's CGL policy contains two business risk exclusions relevant here:  (1) damage to your product and (2) damage to your work. Generally speaking, "[t]he business risk exclusions eliminate coverage for liability for property damage to the insured's own work or product." *American Girl, Inc.*, 268 Wis. 2d 16, ¶47.  Thus, the damage to "your product" exclusion provides that property damage to "'your product' arising out of it or any part of it" is not covered.  Likewise, the damage to "your work" exclusion provides that property damage to "'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'" is not covered.  However, the "your work" exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."

¶31    "Your product" is defined in the policy as:  (1) "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:  (a) [y]ou; (b) [o]thers trading under your name; or (c) [a] person or organization whose business or assets you have acquired" and (2) "[c]ontainers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products."  "Your work" is defined in the policy as:  (1) "[w]ork or

operations performed by you or on your behalf" and (2) "[m]aterials, parts or equipment furnished in connection with such work or operations."[6]

¶32     Midwest argues that the "your product" exclusion does not apply because the balconies are "real property" and thus are an exception to the exclusion.  Midwest further argues that the full extent of the damage caused by the flaking and bubbling paint is currently unknown because what, if any, damage has been caused to property in addition to the balconies has not yet been determined.  By contrast, Frankenmuth argues that the "your product" exclusion applies to bar coverage because the balconies—which includes the powder coated finish—are the product, as contemplated by the parties when coverage was issued, and therefore, they cannot be considered real property within the meaning of the policy and the exception applies.

¶33     We conclude that the "your product" exclusion does not apply because, based on the facts before us, the "product" at the core of Midwest's claim belongs to another, and Frankenmuth has not clearly shown that this is Midwest's product.  Put simply, the record demonstrates that the product triggering the claims here belongs to Milport, the company who supplied the plaf to Midwest and one of the companies Midwest consulted and relied upon for the process of applying the powder coated finish to the balconies.  Indeed, when Midwest began noticing issues with the paint on the balconies in its shop and began receiving complaints from customers that the paint was peeling and flaking on balconies that were

---

[6] We note that neither party has developed an argument specifically based on the second part of either the definition of "your product" or "your work," and therefore, we do not separately address whether the plaf or powder coating qualifies as "your product" or "your work" based on its status "in connection with" the balconies.

already installed, Midwest was not able to resolve the problem on its own and was reliant on Milport and Neutral Solution to fix the problem with the process they provided to Midwest. We construe the fact that Midwest was unable to devise a solution on its own, particularly without Milport, as support for the fact that Midwest's claim does not relate to its own product but rather that of another. Thus, we conclude that the "your product" exclusion does not apply to bar coverage under the CGL policy because the product at issue was not Midwest's but instead the product of another applied to Midwest's product, namely the aluminum balcony.

¶34 Relatedly, Midwest then argues that the "your work" exclusion does not apply because the claimed damages are not to Midwest's work but derivative of the work of another. In this case, Midwest contends that the damages are to the powder coating product and process designed for and supplied to Midwest by its subcontractor, Milport. Thus, Midwest contends that the claimed damages do not meet the definition of "your work" because it was not Midwest's work and, by extension, the damages then also qualify for any exception for the work of subcontractors.

¶35 In response, Frankenmuth argues that Milport is not a subcontractor but rather a supplier. Thus, Frankenmuth contends that the subcontractor exception to the "your work" exclusion does not apply here.[7]

---

[7] Frankenmuth further argues the point that the powder coating is an integrated system with the balcony that Midwest fabricated such that the powder coating supplied to Midwest by Milport has become an integrated system with Midwest's work. However, as we previously explained, our supreme court has rejected the incorporation of the integrated systems analysis into insurance policy disputes and stated that our focus should be on the policy language. *5 Walworth, LLC v. Engerman Contracting, Inc.*, 2023 WI 51, ¶¶31, 45-47, 408 Wis. 2d 39, 992 N.W.2d 31.

¶36 Similar to the "your product" exclusion, we conclude that the "your work" exclusion does not apply because, based on the facts of record, Midwest's claim arises from the work product of another, namely, Milport and its defective plaf provided to Midwest for painting Midwest's balconies. Despite the fact that the actual painting occurred in Midwest's shop, the record demonstrates that Midwest painted the balconies in close consultation with and under the direction of others, namely Milport and Neutral Solution, and using the process designed by these companies and supplied to Midwest for painting. Thus, Frankenmuth has not demonstrated that this was not simply Midwest's work. Moreover, Midwest eventually identified that the paint issues stemmed from defective plaf that came from Milport. Midwest did not manufacture or supply the plaf, and Midwest used the plaf in the painting process at Milport's direction. Additionally, once Midwest began using another process designed and developed by another company, Midwest stopped having the paint adhesion issues with its balconies. Importantly, Midwest's product and work—the aluminum balconies—remained the same, and it took changing from Milport's product and work to Chemetall's product and work to resolve the issue. Thus, we conclude that this was not Midwest's work and this exclusion does not apply to bar coverage. *See* ***5 Walworth, LLC***, 408 Wis. 2d 39, ¶¶46-47.

## CONCLUSION

¶37 We conclude that Midwest's claim is covered by its insurance policy with Frankenmuth and no exclusions apply to preclude coverage. Consequently, we further conclude that Frankenmuth has a duty to defend Midwest against any claims arising from the paint failures and, if applicable, a duty to indemnify Midwest against those claims. Accordingly, we reverse the circuit court's order

granting judgment in favor of Frankenmuth, and we remand for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.