# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP613 & 2013AP687 |
| COMPLETE TITLE: | Wisconsin Pharmacal Company, LLC, |

<table>
<tr><td></td><td>Wisconsin Pharmacal Company, LLC,<br>        Plaintiff,<br>    v.<br>Nebraska Cultures of California, Inc. and<br>Evanston Insurance Company,<br>        Defendants,<br>Jeneil Biotech, Inc.,<br>        Defendant-Appellant,<br>The Netherlands Insurance Company,<br>        Defendant-Respondent-Petitioner.<br>-------------------------------------------------<br>Wisconsin Pharmacal Company, LLC,<br>        Plaintiff,<br>    v.<br>Nebraska Cultures of California, Inc.,<br>        Defendant-Appellant,<br>Jeneil Biotech, Inc. and The Netherlands<br>Insurance Company,<br>        Defendants,<br>Evanston Insurance Company,<br>        Defendant-Respondent-Petitioner.</td></tr>
</table>

REVIEW OF A DECISION BY THE COURT OF APPEALS
(Reported at 358 Wis. 2d 673, 856 N.W.2d 505)
(Ct. App. 2014 Published)
PDC No: 2014 WI App 111

| | |
|---|---|
| OPINION FILED: | March 1, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 22, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Ozaukee |
| JUDGE: | Thomas R. Wolfgram |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ABRAHAMSON, A.W. BRADLEY, J.J., dissent. (Opinion Filed) |
| NOT PARTICIPATING: | ZIELGER, R.G. BRADLEY, J.J., did not participate. |

ATTORNEYS:

For the defendant-respondent-petitioners, there were joint briefs by *Thomas R. Schrimpf* and *Hinshaw & Culbertson, LLP*, Milwaukee, *Mark F. Wolfe* and *Traub Lieberman Straus & Shrewsberry*, Chicago.  Oral argument by *Thomas Schrimpf* and *Mark F. Wolfe*.

For the defendant-appellant, Jeneil Biotech, Inc., there was a brief by *Douglas M. Raines, James A. Baxter* and *von Briesen & Roper, S.C.*, Milwaukee, and oral argument by *Douglas M. Raines*.

For the defendant-appellant, Nebraska Cultures of California, Inc., there was a brief by *Patryk Silver, Borgelt, Powell, Peterson & Frauen, S.C.*, Madison, and oral argument by *Patryk Silver*.

There was an amicus curiae brief by *James A. Friedman*, *Todd G. Smith*, and *Godfrey & Kahn, S.C.*, Madison on behalf of the Wisconsin Insurance Alliance.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2013AP613 & 2013AP687
(L.C. No.  2011CV32)

STATE OF WISCONSIN            :      IN SUPREME COURT

Wisconsin Pharmacal Company, LLC,

      Plaintiff,

    v.

Nebraska Cultures of California, Inc.,

      Defendant-Appellant,

Jeneil Biotech, Inc. and The Netherlands
Insurance Company,

      Defendants,

Evanston Insurance Company,

      Defendant-Respondent-Petitioner.

**FILED**

**MAR 1, 2016**

Diane M. Fremgen
Clerk of Supreme Court

Wisconsin Pharmacal Company, LLC,

      Plaintiff,

    v.

Nebraska Cultures of California, Inc.,

      Defendant-Appellant,

Jeneil Biotech, Inc. and The Netherlands
Insurance Company,

      Defendants,

Evanston Insurance Company,

Defendant-Respondent-Petitioner.

REVIEW of a decision of the Court of Appeals.  *Reversed.*

¶1  PATIENCE DRAKE ROGGENSACK, C.J.  We review a published decision of the court of appeals[1] reversing an order of the Ozaukee County Circuit Court[2] that granted summary judgment to The Netherlands Insurance Company (Netherlands) and Evanston Insurance Company (Evanston).  Our review centers on a coverage dispute between the insurers and their respective insureds, Jeneil Biotech, Inc. (Jeneil) and Nebraska Cultures of California, Inc. (Nebraska Cultures).  The underlying claims against the insureds arise from their supplying a defective ingredient for incorporation into the plaintiff's, Wisconsin Pharmacal Company (Pharmacal), probiotic supplement tablets.

¶2  The insurers argue that the insurance policies do not provide coverage for damages that may arise out of the underlying claims against the insureds.  Specifically, the issues before us are:  (1) whether the incorporation of a defective ingredient into the supplement tablets constitutes "property damage" caused by an "occurrence" under the policies'

---

[1] Wis. Pharmacal Co. v. Neb. Cultures of Cal., Inc., 2014 WI App 111, 358 Wis. 2d 673, 856 N.W.2d 505.

[2] The Honorable Thomas R. Wolfgram of Ozaukee County presided.

language; and (2) if there is "property damage" caused by an "occurrence," whether any of the policies' exclusions apply to negate coverage.

¶3  We conclude that there is no "property damage" caused by an "occurrence" because the incorporation of a defective ingredient into the supplement tablets did not damage other property and did not result in loss of use of property.  We further conclude that, even if the incorporation of a defective ingredient were to constitute "property damage" caused by an "occurrence," certain exclusions in both policies apply to negate coverage.  Accordingly, we reverse the decision of the court of appeals.

## I.  BACKGROUND

¶4  Pharmacal supplies a Daily Probiotic Feminine Supplement to a major retailer.  This supplement is in the form of a chewable tablet and contains various ingredients, including a probiotic bacterial species known as <u>Lactobacillus</u> <u>rhamnosus</u> (LRA).  In July of 2008, Pharmacal contacted Nutritional Manufacturing Services, LLC to manufacture supplement tablets containing LRA.  Nutritional Manufacturing agreed to procure LRA and manufacture supplement tablets containing that ingredient.  In order to procure LRA for production of supplement tablets, Nutritional Manufacturing contacted Nebraska Cultures, which agreed to supply LRA.  Nebraska Cultures then contracted with Jeneil to supply LRA to Nebraska Cultures for subsequent sale to Nutritional Manufacturing.  Nutritional Manufacturing thereafter

3

obtained the ingredient from Nebraska Cultures along with a "Certificate of Analysis," representing the ingredient as LRA.

¶5  Having supposedly acquired LRA from Nebraska Cultures, Nutritional Manufacturing manufactured supplement tablets using the provided ingredient, which was defective because it constituted a different species of bacteria, <u>Lactobacillus acidophilus</u> (LA), rather than LRA.  This manufacturing process required blending other ingredients that were obtained from other vendors, with the defective probiotic ingredient supplied by Nebraska Cultures and Jeneil.  Once all of the ingredients were blended together, they were compressed into tablet form.  Once mixed and compressed into tablet form, none of the ingredients could be separated from one another.  After manufacturing supplement tablets, Nutritional Manufacturing supplied them to Pharmacal, which, in turn, packaged and shipped them to the retailer.

¶6  In April of 2009, the retailer notified Pharmacal that the supplement did not contain LRA but, rather, it contained LA. Pharmacal performed independent testing on supplement tablets and confirmed that they contained LA rather than the contracted-for LRA.  Upon this confirmation, Pharmacal notified the retailer that the supplements were mislabeled as containing LRA when they actually contained LA.  In May of 2009, the retailer recalled the supplement.  After the recall, Pharmacal destroyed the supplement tablets containing the defective ingredient.

¶7  Nutritional Manufacturing assigned any and all of its causes of action against Nebraska Cultures and Jeneil to

4

Pharmacal. On January 14, 2011, Pharmacal filed suit against Nebraska Cultures and its general liability insurer, Evanston, as well as Jeneil and its general liability insurer, Netherlands. Pharmacal alleged numerous causes of action,[3] including various tort and contract claims. Additionally, Nebraska Cultures filed a cross claim against Jeneil for negligence. In October of 2011, the circuit court dismissed with prejudice all of Pharmacal's claims against Jeneil and Netherlands. With respect to the claims against Nebraska Cultures and Evanston, the circuit court dismissed with prejudice all tort claims. Therefore, the remaining claims include: (1) Nebraska Cultures' cross claim against Jeneil for negligence;[4] and (2) Pharmacal's various contract-based claims against Nebraska Cultures. All of these claims allege that Jeneil and Nebraska Cultures incorrectly supplied LA to Nutritional Manufacturing and Pharmacal when the parties had contracted for LRA.

¶8 Subsequently, Netherlands and Evanston moved to bifurcate and stay the merits of the proceedings pending the circuit court's determination of whether their respective

---

[3] Because Nutritional Manufacturing assigned all claims to Pharmacal, we refer to all claims as Pharmacal's claims.

[4] At oral argument, counsel indicated that Jeneil had elected not to move to dismiss this claim. The merits of the underlying claims between the various parties are not before us, and therefore, we do not address the propriety of this remaining cross claim for negligence.

insurance policies provided coverage, thereby triggering the insurers' duties to defend and indemnify. Netherlands and Evanston moved for summary judgment, arguing that the insurance policies did not cover any damages that may arise out of the remaining causes of action against Jeneil and Nebraska Cultures because there was no property damage caused by an occurrence.

¶9 In October of 2012 and January of 2013, the circuit court held two hearings[5] on the coverage issue and ultimately granted the insurers' motions for summary judgment. The circuit court concluded that the facts of the case did not trigger the insurers' duties to defend. Specifically, the circuit court concluded that the incorporation of a defective probiotic ingredient into the tablets did not constitute property damage caused by an occurrence because it harmed only the product itself, which is an integrated system.

¶10 The court of appeals reversed the circuit court's grant of summary judgment, concluding that the policies provided coverage. Wis. Pharmacal Co. v. Neb. Cultures of Cal., Inc., 2014 WI App 111, 358 Wis. 2d 673, 856 N.W.2d 505. The court of appeals concluded that the integrated system rule was not relevant to the coverage dispute and that the incorporation of a defective ingredient constituted property damage to the product (the probiotic supplement tablets) caused by an occurrence under the policies' language and that no exclusion negated coverage.

---

[5] After the first hearing, the circuit court allowed the parties to conduct discovery on the coverage issue.

Id., ¶¶20-26.  The court of appeals also held that Netherlands breached its duty to defend[6] by "reject[ing] Jeneil's initial tender, prior to the discovery of additional facts bearing on coverage."  Id., ¶39.

¶11  We granted the insurers' joint petition for review.

II.  DISCUSSION

A.  Standard of Review

¶12 Reviewing a grant of summary judgment, we independently apply the same methodology as the circuit court and the court of appeals while benefitting from their analyses. Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶16, 360 Wis. 2d 129, 857 N.W.2d 136.  "The standards set forth in Wis. Stat. § 802.08 are our guides."  Id.  Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (2013-14).

¶13  While the parties do not dispute the facts giving rise to the underlying causes of action, our review requires us to interpret the insurance policies.  "The interpretation of an insurance [policy] is a question of law that we review

---

[6] At oral argument, counsel indicated that Netherlands refused to provide Jeneil with any defense, while Evanston had provided Nebraska Cultures with an initial defense.

7

independently." Siebert v. Wis. Am. Mut. Ins. Co., 2011 WI 35, ¶28, 333 Wis. 2d 546, 797 N.W.2d 484.

### B. Choice of Law

¶14 Initially, we note that there are two insurance policies at issue in this case. Jeneil's coverage is governed by the Netherlands policy, while Nebraska Cultures' coverage is governed by the Evanston policy. The parties agree that the Netherlands policy should be interpreted according to Wisconsin law, while the Evanston policy should be interpreted according to California law. We agree as well.

¶15 When parties do not specifically provide a choice of law provision in the policy, we have "adopted the 'grouping-of-contacts' approach for resolving conflicts questions raised as to a disputed contract." Utica Mut. Ins. Co. v. Klein & Son, Inc., 157 Wis. 2d 552, 556, 460 N.W.2d 763 (Ct. App. 1990). This approach provides that insurance coverage is "determined by the law of the [jurisdiction] with which the contract has its most significant relationship." State Farm Mut. Auto. Ins. Co. v. Gillette, 2002 WI 31, ¶26, 251 Wis. 2d 561, 641 N.W.2d 662 (alteration in original) (internal quotation marks and citation omitted).

¶16 We conclude, as agreed by the parties, that Wisconsin has the most significant relationship to the Netherlands policy. Accordingly, we interpret the Netherlands policy in accordance with Wisconsin law. We further conclude, as agreed by the parties, that California has the most significant relationship

8

to the Evanston policy. Accordingly, we interpret the Evanston policy in accordance with California law.

### C. Duty to Defend

¶17 As another initial matter, we address the court of appeals' conclusion that Netherlands breached its duty to defend by "reject[ing] Jeneil's initial tender, prior to the discovery of additional facts bearing on coverage." Wis. Pharmacal, 358 Wis. 2d 673, ¶39. At oral argument, Jeneil contended that a remand is necessary to determine the consequences of Netherlands' breach of the duty to defend.

¶18 Contrary to the court of appeals' holding, "[a]n insurer does not breach its contractual duty to defend by denying coverage where the issue of coverage is fairly debatable as long as the insurer provides coverage and defense once coverage is established." Elliott v. Donahue, 169 Wis. 2d 310, 317, 485 N.W.2d 403 (1992). An insurer may avoid breaching the duty to defend by requesting "a bifurcated trial on the issues of coverage and liability[] [and] mov[ing] to stay any proceedings on liability until the issue of coverage is resolved." Id. at 318. However, "[a]n insurer may need to provide a defense to its insured when the separate trial on coverage does not precede the trial on liability and damages." Mowry v. Badger State Mut. Cas. Co., 129 Wis. 2d 496, 528, 385 N.W.2d 171 (1986) (emphasis added); Elliott, 169 Wis. 2d at 318.

¶19 In this case, Netherlands and Evanston jointly moved to bifurcate and stay the proceedings pending a determination of coverage. Although Evanston provided an initial defense, the

9

circuit court ultimately concluded that the insurers' duties to defend were not triggered because their respective policies did not provide coverage. As this coverage determination by the circuit court properly came prior to any proceedings regarding the merits of the underlying claims, Netherlands did not breach its duty to defend. We now turn to the discussion of whether there is coverage under the policies.

## D. Coverage, General Principles

¶20 We interpret insurance policies from the perspective of a reasonable insured. Acuity v. Bagadia, 2008 WI 62, ¶13, 310 Wis. 2d 197, 750 N.W.2d 817. When the language of an insurance contract is unambiguous, we apply its plain and ordinary meaning. Preisler, 360 Wis. 2d 129, ¶18.

¶21 However, if terms of an insurance contract are "fairly susceptible to more than one reasonable interpretation," the policy is ambiguous. Id., ¶19 (quoting Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶23, 338 Wis. 2d 761, 809 N.W.2d 529). "Policy language is not ambiguous merely because more than one dictionary definition exists or the parties disagree about its meaning." Id. Similarly, policy language is not ambiguous merely because courts have come to differing interpretations. Peace v. Nw. Nat'l Ins. Co., 228 Wis. 2d 106, ¶60, 596 N.W.2d 429 (1999). If the policy is ambiguous, the court's construction is constrained and ambiguities are construed against the insurer, in favor of coverage. Hirschhorn, 338 Wis. 2d 761, ¶23.

10

¶22 Bearing the foregoing in mind, we determine whether the policies provide coverage for incorporation of a defective ingredient into supplement tablets. Our procedure for determining whether coverage exists under an insurance policy follows three steps. First, "we examine the facts of the insured's claim to decide whether the policy makes an initial grant of coverage." Preisler, 360 Wis. 2d 129, ¶22. If the policy terms clearly do not cover the claim, generally, our analysis ends. Id. However, "if the claim . . . triggers a potential grant of coverage, we secondly examine whether any of the policy's exclusions preclude coverage for that claim." Id. And third, "if an exclusion precludes coverage, we analyze exceptions to the exclusion to determine whether any exception reinstates coverage." Id.

E.   Initial Grant of Coverage

1.   Netherlands policy

¶23 Netherlands' commercial general liability (CGL) policy provides coverage for Jeneil's losses that "the insured becomes legally obligated to pay as damages because of 'bodily injury'[7] or 'property damage' . . . caused by an 'occurrence.'" The policy defines property damage as "(a) Physical injury to tangible property, including all resulting loss of use of that property. . . .; or (b) Loss of use of tangible property that is

---

[7] As the parties agree that no "bodily injury" has occurred, we do not address that policy language.

not physically injured." We first discuss whether there is property damage under either definition.

### a. property damage (physical injury)

¶24 With respect to the standard CGL definition of property damage, we previously have concluded that,

> The risk intended to be insured [in a CGL policy] is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable.

Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶27, 233 Wis. 2d 314, 607 N.W.2d 276 (alteration in original) (emphasis added) (internal quotation marks and citation omitted). Stated otherwise, the insured risk (i.e., physical injury to tangible property) applies to physical injury to tangible property other than, but which is caused by, a defect in the product or work the insured supplied. Vogel v. Russo, 2000 WI 85, ¶17, 236 Wis. 2d 504, 613 N.W.2d 177) abrogated, in part, on other grounds by Ins. Co. of N. Am. v. Cease Elec. Inc., 2004 WI 139, ¶25 n.6, 276 Wis. 2d 361, 688 N.W.2d 462.

¶25 In Vogel, where the CGL policy defined property damage using the same terms as does the Netherlands' policy, we carefully explained the risk to which CGL policies apply. We again said that,

> [t]he risk intended to be insured [in a CGL policy] is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than

12

to the product or completed work itself, and for which the insured may be found liable.

Id. (emphasis and alteration in original) (quoting Bulen v. W. Bend Mut. Ins. Co., 125 Wis. 2d 259, 264-65, 371 N.W.2d 392 (Ct. App. 1985).

¶26 We emphasized the nature of coverage afforded by a CGL policy: "A CGL policy's sole purpose is to cover the risk that the insured's goods, products, or work will cause bodily injury or damage to property other than the product or the completed work of the insured." Id. at 513 (emphasis in original). "A CGL policy, therefore, is not a performance bond."[8] Id. (further citations omitted). Therefore, we must determine whether the incorporation of LA, the defective component Jeneil provided, into the supplement tablets constitutes physical injury to tangible property other than the LA itself.

¶27 To answer the question of what constitutes other property that has suffered physical injury, we analyze whether a supplement tablet is an integrated system because if it is, damage to the system has been defined as damage to the product itself, not damage to other property. See Wausau Tile, Inc. v. Cnty. Concrete Corp., 226 Wis. 2d 235, 249, 593 N.W.2d 445

_____

[8] A performance bond ensures successful completion of a contractual obligation. As Couch on Insurance explains, performance bonds protect the person to whom a contractual obligation is owed from the risk of loss directly arising from another's failure to perform according to the terms of a contract. Steven Plitt, Daniel Maldonado & Joshua D. Rogers, 1 Couch on Insurance § 1:15 (3d ed. 2009).

13

(1999).  We have explained how an integrated system affects the determination of what property is "other property" as follows:

> What constitutes harm to other property rather than harm to the product itself may be difficult to determine.  A product that nondangerously fails to function due to a product defect has clearly caused harm only to itself.  A product that fails to function and causes harm to surrounding property has clearly caused harm to other property.  However, when a component part of a machine or a system destroys the rest of the machine or system, the characterization process becomes more difficult.  When the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself.

Id. at 249-50 (emphasis in original) (quoting Restatement (Third) of Torts § 21 cmt. e (1997)).[9]  In short, "[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' . . . "  Id. at 249 (citing East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 867-68 (1986)).

¶28 An integrated system analysis is necessary when evaluating coverage under a CGL policy because we must decide whether the product is to be treated as a unified whole or whether a defective component can be separated out such that the claimed damage constitutes damage to property other than the defective component itself.  Id. at 250-52.

¶29 For example, in Wausau Tile, the manufacturer sold and distributed concrete paving blocks, which were "made of cement,

---

[9] We note there is no allegation that tablets containing LA were dangerous.

14

aggregate, water, and other materials, for use mainly in exterior walkways." Id. at 241. The manufacturer contracted with another company to supply the cement and yet another company to supply the aggregate for incorporation into the paving blocks. Id. After incorporation, the paving blocks "suffered excessive expansion, deflecting, curling, cracking and/or buckling." Id. at 242 (internal quotation marks and citation omitted). These problems with the paving blocks resulted from defects in both cement and aggregate. Id.

¶30 We employed an integrated system analysis to determine whether paving blocks were integrated systems comprised of cement, aggregate, and other components because if they were, damage by a defective component of an integrated system to other system components is not property damage to other property. Id. at 251-52. We concluded that because all components were combined to form paving blocks and the components could not be separated from the finished product, all components were part of an integrated system. Id. at 251. As such, we rejected the manufacturer's "contention that the [paving blocks]

15

constitute[d] property other than the defective cement" itself.[10] Id. at 251-52.

¶31 While in Wausau Tile we employed the economic loss doctrine to preclude tort claims for breaches of contract and/or warranty, id. at 246, more importantly, we explained that it is through an integrated system analysis that we determine what constitutes "other property." Id. at 250-51. Deciding whether the complained of injury is to other property is important because it is only damage to other property that is covered under a CGL policy. Vogel, 236 Wis. 2d 504, ¶17; Wis. Label, 233 Wis. 2d 314, ¶27.

¶32 The court of appeals correctly discerned that the economic loss doctrine does not control a coverage dispute and, therefore is not at issue here. However, the court of appeals overlooked significant portions of our decision in Wausau Tile, where we also discussed whether there was insurance policy coverage for the claimed damage. Wausau Tile, 226 Wis. 2d at 266-69. Simply stated, the court of appeals did not perceive the importance of an integrated system analysis when deciding

[10] The Supreme Court also has discussed integrated systems. In East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986), the Court considered whether there was damage to other property where defective component parts were incorporated into a turbine. As a result of the defective parts, the turbine failed and was damaged. Id. at 867-68. Although recognizing that the integrated system had been negligently manufactured, the Court held that the turbine must be regarded as a single unit. Id. at 867. Therefore, any resulting damage to it or its component parts constituted only damage to the property itself. Id.

whether claimed damage arose from physical injury to tangible property other than to the LA.  See Wis. Pharmacal, 358 Wis. 2d 673, ¶19.  Instead, the court of appeals applied law from other jurisdictions to reason that a product may be "physically injured by the incorporation of a defective, faulty, or inadequate part."  Id., ¶20.  Thereafter, the court of appeals incorrectly concluded that incorporation of a defective ingredient into the supplement tablets caused property damage by physically injuring other ingredients in the tablets.  Id.

¶33 The policy language at issue in Wausau Tile is substantively identical to Netherlands' policy language.  Wausau Tile, 226 Wis. 2d at 267 n.18.  There, we concluded that the manufacturer's claims did not allege property damage because, as set forth above, damage by a defective component of an integrated system to either the system as a whole or other system components is not separable as damage to other property for which coverage is provided by a CGL policy.  See id. at 250-52, 267-68.

¶34 Similarly, applying an integrated system analysis to the instant case, we conclude that combining a defective ingredient with other ingredients and incorporating them into supplement tablets, formed an integrated system.  Pharmacal could not separate out the LA from the other ingredients or the other ingredients from each other.  No damage resulted to property other than ingredients of the integrated system and the completed product, the tablets.  Stated otherwise, upon blending

17

LA, rather than LRA, with other ingredients, all of the ingredients were integrated into one product, the tablets.

¶35 Therefore, similar to the effect of cement being incorporated with other components into the paving blocks in Wausau Tile, the effect of LA being incorporated with the other ingredients into tablets cannot be said to constitute damage to other property. Accordingly, we conclude that the complained of injury was sustained by the integrated system itself, i.e. the tablets, such that no other property was injured.

¶36 Furthermore, there was no physical injury to tangible property caused by LA. To constitute "physical injury," property other than LA must have been physically altered by the LA. Vogel, 236 Wis. 2d 504, ¶17; Wis. Label, 233 Wis. 2d 314, ¶31; Travelers Ins. Co. v. Eljer Mfg., Inc., 757 N.E.2d 481, 496 (Ill. 2001). Additionally, there must be an element of causation. Wis. Label, 233 Wis. 2d 314, ¶32; Smith v. Katz, 226 Wis. 2d 798, 822, 595 N.W.2d 345 (1999).

¶37 Pharmacal argues that there was physical injury due to blending other ingredients with LA into tablets. However, there was no factual foundation presented from which one could conclude that creating tablets using LA physically altered other ingredients in a way that would not have occurred if LRA had been used in the same tableting process. Stated otherwise, any changes to other ingredients were not a result of the defective ingredient; rather, any changes were a result of the tableting process that would have occurred regardless of which probiotic ingredient was supplied. Yet, property damage under the first

18

definition in the Netherlands policy requires <u>physical injury</u> to tangible property that is caused by the insured. Accordingly, we conclude that there was no "physical injury to tangible property.

¶38 Finally, Jeneil asserts that the cartons, shippers, inserts, tooling and dies associated with the supplement tablets suffered physical injury, thereby constituting property damage to tangible property. However, the materials associated with shipping the supplement tablets did not undergo any physical alterations due to LA. The presence of the defective ingredient in the tablets did not cause any alterations to these materials that would not have otherwise occurred. For example, the defective ingredient did not cause the tablets to explode or corrode through the shipping materials such that they underwent some physical alteration that would not have occurred if the tablets had contained the contracted-for LRA. Therefore, we conclude that there is no physical injury to the cartons, shippers, inserts, tooling and dies caused by the defective ingredient.

¶39 We next consider whether the incorporation of a defective ingredient constitutes property damage due to "loss of use of tangible property that is not physically injured" under the Netherlands policy.

b. property damage (loss of use)

¶40 As set forth above, Pharmacal's underlying claims allege that Jeneil incorrectly supplied LA to Nutritional Manufacturing and Pharmacal when the parties agreed upon, and

19

paid for, LRA. According to Jeneil, the incorporation of a defective ingredient rendered the other ingredients and the supplement tablets totally useless to Pharmacal, thereby constituting property damage due to "loss of use of tangible property that is not physically injured."

¶41 However, we previously have stated that "[d]iminution in value——even to the point of worthlessness——is not the same as 'loss of use' under the insurance policy, which by its plain language contemplates some sort of loss of use in fact, not a reduction in value." Vogel, 236 Wis. 2d 504, ¶26.

¶42 In Vogel, the plaintiffs hired a contractor to build their home. Id., ¶3. The contractor, in turn, hired a subcontractor to perform the foundational work, concrete work and brick work. Id. Upon completion of the home, a number of deficiencies in the workmanship were discovered. Id., ¶¶4-7. Among other things, the plaintiffs could not use their fireplaces, the brickwork was incomplete, and the walls were shoddily constructed. Id., ¶¶6-7. After trial, the circuit court found that the home was "essentially a 'tear-down'" and that the entire home was worthless as constructed. Id., ¶¶12-13. The plaintiffs were awarded various damages, including cost of repair and replacement damages for the defective masonry work. Id., ¶12. The subcontractor sought coverage under its CGL policy. See id. We held that, although the home was essentially worthless in value due to the defective workmanship and needed to be reconstructed, such damages for diminution in value did not constitute "property damage" caused by "loss of

20

use." Id., ¶26. The homeowners lost the entire value of their home; they did not simply lose its use for some period of time. Id.

¶43 Here, Jeneil similarly failed to perform in the manner in which it had contractually agreed to perform. Jeneil erroneously supplied LA, which was incorporated into the supplement tablets. Once Pharmacal and the retailer realized that the tablets contained LA rather than LRA, the tablets were recalled. The recalled tablets were worthless due to the inclusion of LA rather than LRA and were subsequently discarded. As with the homeowners in Vogel who lost the entire value of their home, Pharmacal did not lose the use of the tablets; rather, it permanently lost the entire value of the tablets.

¶44 Furthermore, although Wisconsin appellate courts have held that property damage caused by loss of use may occur with temporary loss, they never have concluded that loss of use may occur when the loss of the property is permanent.

¶45 For example, the court of appeals held that there was loss of use when a farmer temporarily could not use his field for an entire growing season. W. Cas. & Sur. Co. v. Budrus, 112 Wis. 2d 348, 352, 332 N.W.2d 837 (Ct. App. 1983). In Budrus, the farmer purchased 400 pounds of seed labeled "Birdsfoot," which is feed for cows. Id. at 350. However, after planting the seed on his 40-acre field, he discovered that the seed had been mislabeled and that it was actually "Rape" seed, which is feed for pigs and was useless to him. Id. The farmer sued the seed supplier for damages resulting from crop loss and loss of

21

production, as it was too late into the season to replant.  Id.;
Wis. Label, 233 Wis. 2d 314, ¶54.  The supplier sought coverage
under his insurance policy, and the court of appeals concluded
that there was property damage due to loss of use of the
farmer's 40-acre field.  Budrus, 112 Wis. 2d at 352.

¶46 As the farmer was temporarily unable to use his
property until the next growing season, such damages constituted
loss of use under the insurance policy.  See id.  However, in
contrast to Pharmacal's tablets, the farmer's property was not
rendered permanently worthless such that he lost the entire
value of the field without the possibility of restoration.

¶47 Similarly, we have held that loss of use includes
damages arising from the removal and repair of a manufacturer's
defective transformer.  Sola Basic Indus., Inc. v. U.S. Fid. &
Guar. Co., 90 Wis. 2d 641, 654, 280 N.W.2d 211 (1979).  In Sola
Basic, the manufacturer used a transformer to operate its
electric furnace, which, in turn powered the manufacturer's
plant.  Id. at 647.  When a defective transformer had to be
removed and repaired, the electric furnace was rendered
unusable, causing the manufacturer to sustain additional costs
in order to operate its plant.  Id.  We concluded that these
damages, resulting from the inability to use the electric
furnace while the transformer was being repaired, constituted
loss of use under the insurance policy's language.  Id. at 654.

¶48 It is also significant that the temporary inability to
use the electric furnace during repair of the transformer in
Sola Basic was a loss of use of property other than the

22

defective product (the transformer), just as the loss of use of the farmer's field in Budrus was a temporary inability to use property other than the defective product (the seed). By contrast, in the case before us, the claim for loss of use is a permanent loss of use of the defective product itself, the tablets.

¶49 While Jeneil argues that the incorporation of a defective ingredient rendered the tablets and other ingredients useless, thereby constituting loss of use, Pharmacal did not actually lose use of the tablets. Instead, Pharmacal permanently lost the entire value of the tablets. Accordingly, we conclude that the Netherlands policy does not provide coverage because there is no property damage due to "loss of use of tangible property that has not been physically injured."[11]

¶50 As we have concluded that incorporation of LA, the defective ingredient, into the tablets does not constitute property damage under either definition of the Netherlands policy, there is no initial grant of coverage. However, in the interest of completeness, we proceed to consider whether there has been an "occurrence."

c. occurrence

¶51 The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the

_____
[11] For these same reasons, we further conclude that the policy does not provide coverage for the permanent loss of use of the cartons, shippers, inserts, tooling and dies associated with the supplement tablets.

23

same general harmful conditions." While Jeneil intentionally provided a probiotic ingredient, the parties do not dispute that Jeneil's provision of a defective ingredient was accidental. However, we are not persuaded, simply because Jeneil accidently supplied a defective ingredient, that this constitutes an "occurrence" for purposes of coverage under the policy.

¶52 To the contrary, we note that, while faulty workmanship "can give rise to property damage caused by an 'occurrence,'" it does not follow that faulty workmanship itself constitutes an occurrence. Glendenning's Limestone & Ready-Mix Co. v. Reimer, 2006 WI App 161, ¶30, 295 Wis. 2d 556, 721 N.W.2d 704 (quoting Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶48, 268 Wis. 2d 16, 673 N.W.2d 65).

¶53 For example, in American Girl, a soil engineer negligently gave faulty advice regarding the ability of the soil to support a building. Am. Girl, 268 Wis. 2d 16, ¶¶12-13. After the building was constructed pursuant to that advice, the soil began to settle, which caused the building to sink and sustain damage. Id., ¶¶13-14. We held that soil settlement, which lead to sinking and cracking of the building, constituted an "occurrence" under the policy. Id., ¶5; see Glendenning's Limestone, 295 Wis. 2d 556, ¶27. Importantly, although the soil engineer negligently, or accidentally, rendered the faulty advice, this advice was not an "occurrence." Am. Girl, 268 Wis. 2d 16, ¶5. Rather, the faulty advice caused the "occurrence," which, in turn, caused property damage. Id.

24

¶54 Similarly, where windows were defectively constructed, that defective construction did not, in itself, constitute an "occurrence" simply because defects arose via an accident. Glendenning's Limestone, 295 Wis. 2d 556, ¶28 (citing Kalchthaler v. Keller Constr. Co., 224 Wis. 2d 387, 391, 392 n.2, 591 N.W.2d 169 (Ct. App. 1999)). However, when defective windows allowed rain to leak inside, thereby causing property damage to wooden floors within the building, the leaking of the windows constituted an "occurrence." Id., ¶29.

¶55 In light of the foregoing, we conclude that, although a breach of contract may give rise to property damage caused by an "occurrence," a breach of contract, standing alone, does not constitute an "occurrence." See id., ¶39 (explaining that "[a]n 'accident' may be caused by faulty workmanship, but every failure to adequately perform a job, even if that failure may be characterized as negligence, is not an 'accident,' and thus not an 'occurrence' under the policy.").

¶56 In the instant case, Jeneil's provision of a defective ingredient is analogous to the soil engineer's faulty advice and the defectively constructed windows. An accidental provision of a defective ingredient does not constitute an "occurrence" in and of itself. Therefore, we conclude that there is no property damage caused by an "occurrence" as defined by the Netherlands policy. Consequently, this also precludes an initial grant of coverage under the Netherlands policy. We now consider whether there is an initial grant of coverage under the Evanston policy.

25

2. Evanston policy

¶57 Evanston's CGL policy similarly provides coverage for Nebraska Cultures' losses arising out of "bodily injury" or "property damage" caused by an "occurrence." The policy defines "property damage" as "physical injury to or destruction of tangible property including, consequential loss of use thereof; o[r] loss of use of tangible property which has not been physically injured or destroyed."

¶58 California CGL policies have been described as follows:

> General liability policies, such as the ones in dispute here, are not designed to provide contractors and developers with coverage against claims [that] their work is inferior or defective. The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. Rather[,] liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products. . . . "This distinction is significant. Replacement and repair costs are to some degree within the control of the insured. They can be minimized by careful purchasing, inspection of material, quality control and hiring policies. If replacement and repair costs were covered, the incentive to exercise care or to make repairs at the least possible cost would be lessened since the insurance company would be footing the bill for all scrap."

Maryland Cas. Co. v. Reeder, 221 Cal. App. 3d 961, 967 (Cal. Ct. App. 1990) (citations omitted).

¶59 Bearing these principles in mind, we first discuss whether there is property damage under either policy definition.

a. property damage (physical injury)

¶60 Under California law, "property damage is not established by the mere failure of a defective product to perform as intended." F & H Constr. v. ITT Hartford Ins. Co. of the Midwest, 118 Cal. App. 4th 364, 372 (Cal. Ct. App. 2004); Reeder, 221 Cal. App. 3d at 969. Simply stated, a liability insurance policy is not a performance bond. F & H Constr., 118 Cal. App. 4th at 373.

¶61 Also, when considering whether a defective product has caused property damage, California courts examine whether the defective product is hazardous. If the defective product is hazardous, courts have found immediate property damage to other property caused by a defective product. See Watts Indus., Inc. v. Zurich Am. Ins. Co., 121 Cal. App. 4th 1029, 1044-46 (Cal. Ct. App. 2004) (concluding that a hazardous product manufactured with excessive lead percentages permitted lead to leach into water flowing in contact with the product, causing damage to other property).

¶62 However, under California law, when contractually nonconforming pile caps were welded onto steel composite piles that had been driven into the ground to support a water pumping facility, no property damage occurred because the nonconforming caps did not result in physical injury to other property. F & H Constr., 118 Cal. App. 4th at 373-74. To explain further, the parties contracted for grade A-50 caps, but grade A-36 caps were supplied and subsequently welded onto the piles, thereby rendering the pilings inadequate to support the building. Id.

27

The court determined that, even though the contractually nonconforming caps rendered the pilings inadequate for their intended purpose, there was no property damage to the piles or any other property.  Id.

¶63 This is in contrast to a situation in which hazardous property is connected to a building such that it damages the building.  For example, property damage was found where asbestos was connected and linked to a building, thereby rendering the entire building's air supply hazardous.  Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co., 45 Cal. App. 4th 1, 92-94 (Cal. Ct. App. 1996).   Similarly, where a nut cluster cereal was contaminated by wood splinters, there was property damage because the splinters rendered the cereal hazardous for consumption.  Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc., 78 Cal. App. 4th 847, 865-66 (Cal. Ct. App. 2000).  The court stated that there may be a "finding [of] property damage where a potentially injurious material in a product causes loss to other products."  Id.  However, "property damage is not established by the mere failure of a defective product to perform as intended."  F & H Constr., 118 Cal. App. 4th at 372.

¶64 In the instant case, a defective ingredient was incorporated into the supplement tablets.  Unlike the obvious hazardousness of asbestos connected to a building or wood splinters in cereal, there is no evidence suggesting that the defective probiotic ingredient, LA, is hazardous.  The tablets were simply labeled as containing one probiotic ingredient when they actually contained another.  Therefore, due to the

incorporation of a defective ingredient, the tablets were not the product for which the parties had contracted.

¶65 Although a defective ingredient rendered the tablets inadequate for their contracted purpose, the mere presence of a defective ingredient did not render them hazardous. Accordingly, we conclude that there is no property damage under this policy definition.[12] We next consider whether there is property damage due to "loss of use of tangible property that has not been physically injured" under the Evanston policy.

b. property damage (loss of use)

¶66 Under California law, loss of use damages refer to the rental value of temporary replacement property, rather than the value of replacing the property itself. Advanced Network, Inc. v. Peerless Ins. Co., 190 Cal. App. 4th 1054, 1062-63 (Cal. Ct. App. 2010). Such damages for loss of use of property are distinct from loss of property. Id. at 1062. California courts utilize the following example to illustrate this distinction:

> [A]ssume that an automobile is stolen from its owner. The value of the "loss of use" of the car is the rental value of a substitute vehicle; the value of the "loss" of the car is its replacement cost. . . . The measure of damages for the loss of use of personal property may be determined with reference to the rental value of similar property which the plaintiff can hire for use during the period when he is deprived of the use of his own property.

---

[12] For these same reasons, we further conclude that the incorporation of a defective ingredient does not constitute physical injury to the cartons, shippers, inserts, tooling and dies associated with the supplement tablets.

<u>Collin v. Am. Empire Ins. Co.</u>, 21 Cal. App. 4th 787, 818 (Cal. Ct. App. 1994) (internal quotation marks and citation omitted). Moreover, while Pharmacal may not be able to use its property because it is permanently unusable, such damages do not constitute loss of use damages but, rather, "the value of the property itself.  Had [the insurer] wished to insure 'loss of property,' its policy would have so provided."  <u>Id.</u> at 818-19. Therefore, where damages are unrelated to the rental value of temporary replacement property, such damages do not constitute loss of use under California law.  See <u>F & H Constr.</u>, 118 Cal. App. 4th at 377.

¶67 As set forth, in full, above, the incorporation of a defective ingredient rendered the tablets worthless for their contracted purpose, and they were discarded due to their lack of value.  Therefore, Pharmacal's underlying claims are not for loss of use damages because they relate to the permanent uselessness of the tablets and not to the value of temporary replacement property.[13]  Accordingly, we conclude that the Evanston policy does not provide coverage because there is no property damage due to "loss of use of tangible property that has not been physically injured."

¶68 As we have concluded that the incorporation of a defective ingredient into the tablets does not constitute

---

[13] For these same reasons, we further conclude that the policy does not provide coverage for the permanent loss of use of the cartons, shippers, inserts, tooling and dies associated with the supplement tablets.

property damage under either definition in the Evanston policy, there is no initial grant of coverage. However, in the interest of completeness, we proceed to consider whether there has been an "occurrence."

### c. occurrence

¶69 The Evanston policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." California courts interpret "[t]he plain meaning of the word 'accident' [a]s an event occurring unexpectedly or by chance." Ray v. Valley Forge Ins. Co., 77 Cal. App. 4th 1039, 1045-46 (Cal. Ct. App. 1999).

¶70 Under California law, "[a]n accident . . . is never present when the insured performs a deliberate act. . . .[W]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an accident merely because the insured did not intend to cause injury." Id. at 1046 (alterations in original) (internal quotation marks omitted) (quoting Merced Mut. Ins. Co. v. Mendez, 213 Cal. App. 3d 41, 50 (Cal. App. Ct. 1989)).

¶71 For example, in Ray, the California Court of Appeals held that there was no "occurrence" where a roofing consultant negligently gave faulty advice on the suitability of roofing materials for a building. Id. at 1043. The unsuitability of the roofing materials caused the building to be excessively hot, rendering it uninhabitable for certain portions of the year. Id. at 1044-45. The consultant sought coverage under his

31

insurance policy for what the court characterized as breach of contract claims, alleging that the consultant "rendered bad advice" in recommending the roofing materials. Id. at 1045.

¶72 The court held that the faulty advice did not constitute an accident because the consultant deliberately gave the advice and intended the plaintiffs to utilize the roofing materials that he had suggested. Id. at 1046. Therefore, the faulty advice could not be considered an "occurrence" even though it was occasioned by the consultant's negligence. Id.

¶73 In the instant case, Jeneil's provision of a defective ingredient may have been occasioned by negligence; however, Jeneil deliberately supplied the ingredient to Nebraska Cultures, which, in turn, supplied the ingredient to Nutritional Manufacturing. Moreover, Jeneil intended the ingredient to be incorporated into the tablets. Given the deliberate nature of these actions, the provision of a defective ingredient cannot be said to constitute an "occurrence" under California law. Consequently, this also precludes an initial grant of coverage under the Evanston policy.

F. Exclusions

¶74 Finally, although we have concluded that neither policy provides an initial grant of coverage to the respective insureds, in the interest of completeness, we address whether, if there were property damage caused by an "occurrence," exclusions apply and negate coverage.

¶75 Exclusions in insurance policies are written to exclude described risks. Because they may limit coverage that

32

is otherwise available, if they are ambiguous, exclusions are construed narrowly against the drafter of the policy. Frost v. Whitbeck, 2002 WI 129, ¶19, 257 Wis. 2d 80, 654 N.W.2d 225. If the policy language is not ambiguous, we apply the plain meaning of the words employed. Id., ¶17.

¶76 The court of appeals determined that damages stemming from the recall of the supplement tablets were excluded under both policies' recall, or "sistership," exclusions. Wis. Pharmacal, 358 Wis. 2d 673, ¶32. The court of appeals went on to conclude that damages unassociated with the recall expenses were not excluded under any of the policies' remaining exclusions. Id., ¶¶34-35; see Armstrong World, 45 Cal. App. 4th at 113 (explaining that sistership exclusions negate coverage for costs associated with preventative action of the recall, but do not "operate to exclude coverage for actual damage caused by the very product" that is the cause for the recall).

¶77 However, as set forth below, we conclude that, even if the policies were to provide an initial grant of coverage, the plain meaning of both polices' "impaired property" exclusions operate to negate coverage. Therefore, we need not address the sistership exclusions.

1. Netherlands policy

¶78 The Netherlands policy excludes coverage for:

"Property damage" to "impaired property" or property that has not been physically injured, arising out of: (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or (2) A delay or failure by [the insured] or anyone

33

acting on [the insured's] behalf to perform a contract
or agreement in accordance with its terms.

This exclusion does not apply to the loss of use
of other property arising out of sudden and accidental
physical injury to "your product" or "your work" after
it has been put to its intended use.

¶79 This exclusion operates to negate coverage where property damage results from "the failure of the insured's products to meet the level of performance which the insured warranted or represented." Am. Motorists Ins. Co. v. Trane Co., 544 F. Supp. 669, 688 (W.D. Wis. 1982). It also excludes coverage when the insured fails to perform a contract according to its terms. Moreover, the only exception to this exclusion occurs when the damage to other property arises from "sudden and accidental physical injury" to the insured's product. Id.

¶80 Here, there was no sudden and accidental physical injury to the LA, other ingredients or supplement tablets. Nutritional Manufacturing deliberately manufactured the tablets with the ingredients supplied and Pharmacal deliberately destroyed them. Therefore, there can be no loss of other property resulting from sudden and accidental physical injury to the insured's product.[14] Furthermore, because the tablets constituted an integrated system, as we have explained above, there was no damage to other property on that basis as well.

_____

[14] Alternatively, the Netherlands policy excludes "[p]roperty damage" to the insured's product "arising out of it or any part of it." Therefore, even if we were to conclude that there were sudden and accidental physical injury to a defective ingredient, the other ingredients, or the tablets, such damages would be excluded as arising out of Jeneil's product.

Accordingly, the exception to the exclusion is inapplicable. Therefore, we need determine only whether the exclusion itself applies.

¶81 We conclude that it does. Jeneil argues that the incorporation of a defective ingredient constitutes loss of use because the tablets and other ingredients were worthless as labeled and could not be sold. However, we have already concluded that no loss of use of other property occurred. Stated otherwise, any loss of use was due to the incorporation of Jeneil's defective probiotic. The Netherlands policy specifically excludes damages caused by such a loss.

¶82 Furthermore, as repeatedly alleged by Pharmacal, the provision of a defective ingredient constitutes a breach of contract. We agree. The parties contracted for the sale of LRA, but LA was supplied. This failure of Jeneil to perform a contract in accordance with its terms is likewise excluded from the Netherlands policy. Accordingly, we conclude that Netherlands' "impaired property" exclusion operates to negate an initial grant of coverage, if there were such a grant.

## 2. Evanston policy

¶83 The Evanston policy similarly excludes coverage for:

[A]ny Claim based upon or arising out of loss of use of tangible property which has not been physically injured or destroyed resulting from: (i) a delay in or lack of performance by or on behalf of the Named Insured of any contract or agreement; or (ii) a defect, deficiency, inadequacy or dangerous condition in the products, goods or operations of the Named Insured;

35

provided, however, this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Named Insured's Products . . . after such products . . . have been put to use by any person or organization other than an Insured[.][15]

¶84 Under California law, this exclusion precludes coverage for loss of use damages "arising out of [the insured's] negligent failure to perform its contractual obligations" or its defective product or work. Reg'l Steel Corp. v. Liberty Surplus Ins. Corp., 226 Cal. App. 4th 1377, 1394 (Cal. Ct. App. 2014). Pharmacal alleges that Nebraska Cultures breached its contract by supplying a defective ingredient, which was subsequently incorporated into the supplement tablets. Therefore, any resulting loss of use damages arise out of Nebraska Cultures' failure to properly perform its contractual obligations when it provided LA, a defective component of the supplement tablets. Such damages are specifically excluded by the Evanston policy. Accordingly, we conclude that, even if there were an initial

---

[15] For similar reasons as those set forth with respect to the Netherlands policy, the exception to the exclusion is inapplicable. The Evanston policy also excludes coverage for:

[A]ny Claim based upon or arising out of Property Damage to the Named Insured's Products arising out of it or any part of it, or for the cost of inspecting, repairing or replacing any defective or allegedly defective product or part thereof or for loss of use of any defective or allegedly defective product[.]

Therefore, even if we were to conclude that there were physical injury to a defective ingredient, the other ingredients, or the tablets, such damages would be excluded.

36

grant of coverage, Evanston's impaired property exclusion operates to negate such coverage.

### III. CONCLUSION

¶85 In light of the foregoing, we conclude that there is no "property damage" caused by an "occurrence" because the incorporation of a defective ingredient into the supplement tablets did not damage other property and did not result in loss of use of property. We further conclude that, even if the incorporation of a defective ingredient were to constitute "property damage" caused by an "occurrence," certain exclusions in both policies apply to negate coverage. Accordingly, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed and remanded for further proceedings consistent with this opinion.

¶86 ANNETTE KINGSLAND ZIEGLER and REBECCA G. BRADLEY, JJ., did not participate.

37

¶87 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* "Like the ever-expanding, all-consuming alien life form portrayed in the 1958 B-movie classic The Blob, the economic loss doctrine [continues] to be a swelling globule on the legal landscape of this state."[1]

¶88 In the instant case, the majority opinion expands the already swollen flow of economic loss jurisprudence into heretofore unknown territory, grafting the "integrated system" rule from the economic loss doctrine onto the analysis of two commercial general liability (CGL) insurance policies' definitions of "property damage" and "occurrence."

¶89 "Like the Blob, the more it eats, the more it grows."[2]

¶90 The insurance policies at issue provide coverage for losses due to "property damage" arising from an "occurrence" to two suppliers of probiotic bacteria:[3] Nebraska Cultures of California, Inc. and Jeneil Biotech, Inc. Nebraska Cultures is insured by Evanston Insurance Company. Jeneil is insured by Netherlands Insurance Company. For simplicity I will refer to the insurance policies simply as "Nebraska Cultures' policy" and "Jeneil's policy," or, collectively, as "the insurance policies."

---

[1] Grams v. Milk Prods., Inc., 2005 WI 112, ¶57, 283 Wis. 2d 511, 699 N.W.2d 167 (Abrahamson, C.J., dissenting).

[2] 1325 N. Van Buren, LLC v. T-3 Grp., Ltd., 2006 WI 94, ¶69, 293 Wis. 2d 410, 716 N.W.2d 822 (Bradley, J., dissenting).

[3] Probiotics are bacteria and yeasts with beneficial effects on health, particularly digestion.

¶91 The insureds, Nebraska Cultures and Jeneil, contracted with a third party, Nutritional Manufacturing, to supply one type of probiotic bacteria, Lactobacillus rhamnosus A (LRA) for incorporation into probiotic tablets. After the bacteria was incorporated into tablets by Nutritional Manufacturing, the tablets were packaged and sold to a retailer by Pharmacal. The retailer to whom Pharmacal sold the packaged tablets discovered the tablets contained a different probiotic bacteria, Lactobacillus acidophilus (LA). As a result, the mislabeled tablets were withdrawn from the market and destroyed (with their packaging).

¶92 Pharmacal filed suit against Nebraska Cultures and Jeneil. Evanston Insurance Company and Netherlands Insurance Company sought to stay and bifurcate the proceedings. They asserted that no coverage existed under the insurance policies because the incorporation of the wrong probiotic ingredient into Pharmacal's probiotic tablets was not "property damage" caused by an "occurrence," and that even if it were, certain exclusions negated coverage. The majority opinion adopts the position of the two insurance companies.

¶93 I conclude that the court of appeals' interpretation of the insurance policies (an interpretation that does not import elements of the economic loss doctrine) is more persuasive than that of the majority opinion. As a result, I would affirm the decision of the court of appeals.

¶94 One of my chief concerns with the majority opinion is its incorporation of the "integrated system" analysis derived

2

from the tort economic loss doctrine into the interpretation of insurance policies in Wisconsin.[4] The economic loss doctrine is a remedies principle that bars recovery in tort for economic losses stemming from, among other things, a product's failure to perform up to expectations. See Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶¶34-35, 268 Wis. 2d 16, 673 N.W.2d 65 (citing Wausau Tile, Inc. v. Cnty. Concrete Corp., 226 Wis. 2d 235, 245-46, 593 N.W.2d 445 (1999)).

¶95 The majority opinion applies an "integrated system" analysis derived from the economic loss doctrine as explained in Wausau Tile, Inc. v. County Concrete Corp., 226 Wis. 2d 235, 250-52, 593 N.W.2d 445 (1999), a tort liability case (not a case interpreting an insurance policy), to the interpretation of insurance policies. Based on its "integrated system" analysis,

---

[4] Although California law may have a role in the instant case, I question the majority opinion's application of the "grouping-of-contacts" choice of law analysis. The only contacts that the majority opinion notes are that the Netherlands policy was issued to Jeneil in Wisconsin and the Evanston policy was issued to Nebraska Cultures in California. Majority op., ¶16. The majority opinion does not analyze other contacts that may be relevant.

The majority opinion's discussion of choice of law should not be read as a complete or exhaustive application of Wisconsin's choice of law rules; the majority opinion is cursory. See Drinkwater v. Am. Family Mut. Ins. Co., 2006 WI 56, ¶¶32-64, 290 Wis. 2d 642, 714 N.W.2d 568 (reviewing the "checkered past" of Wisconsin's choice of law jurisprudence and discussing the principles that drive choice of law analyses in Wisconsin).

In any event, the majority opinion's interpretation of California law is suspect.

3

rather than on the words of the policies, the majority opinion concludes there is no coverage under the insurance policies "because the incorporation of a defective ingredient into the . . . tablets did not damage other property and did not result in loss of use of property."[5]

¶96 I write separately to make two points.

¶97 First, reading elements of the economic loss doctrine in tort law into the interpretation of insurance policies is unwise and contrary to this court's precedent. As this court has previously stated: "The [economic loss] doctrine does not determine insurance coverage, which turns on the policy language." Am. Girl, 268 Wis. 2d 16, ¶6 (emphasis added).

¶98 Second, I agree with the court of appeals' interpretation of the text of the insurance policies without incorporating elements of the economic loss doctrine.

¶99 Under the text of the insurance policies, the incorporation of the wrong probiotic ingredient in Pharmacal's probiotic supplements was "property damage" caused by an "occurrence," and none of the insurance policies' exclusions negate coverage.

¶100 Accordingly, I would affirm the court of appeals' detailed and well-reasoned decision and hold that the insurance policies provide coverage.

I

---

[5] Majority op., ¶3.

4

¶101 The language of a contract determines the rights and responsibilities of the parties to the contract.

¶102 The goal of a court in interpreting an insurance policy, a contract, is "to determine and carry out the intentions of the parties as expressed by the language of the insurance policy."[6]

¶103 "Insurance coverage depends upon the policy language, not the theory of liability." 1325 N. Van Buren, LLC v. T-3 Grp., Ltd., 2006 WI 94, ¶59, 293 Wis. 2d 410, 716 N.W.2d 822; see also Am. Girl, 268 Wis. 2d 16, ¶¶6, 35.

¶104 The majority opinion's analysis all but ignores this principle, beginning not by analyzing the language of the insurance policies——which define both "property damage" and "occurrence"——but by analyzing whether any such "property damage" was damage to "other property."[7]

¶105 This focus on damage to "other property" by the majority opinion is derived not from the language of the insurance policies (which do not refer to "other property") but rather from tort cases applying the economic loss doctrine. These economic loss cases refer to damage to "other property."

¶106 The economic loss cases state that the doctrine does not bar recovery in tort for "a product purchaser's claims of

---

[6] Day v. Allstate Indem. Co., 2011 WI 24, ¶27, 332 Wis. 2d 571, 798 N.W.2d 199 (citing Folkman v. Quamme, 2003 WI 116, ¶12, 264 Wis. 2d 617, 665 N.W.2d 857).

[7] Majority op., ¶¶24-26. Wisconsin case law interprets and applies these words in insurance policies.

personal injury or damage to property <u>other than the product itself</u>."[8]

¶107 The "other than the product itself" concept is addressed in <u>Wausau Tile</u>. In that case, the economic loss doctrine was used to bar tort claims stemming from the expansion and cracking of concrete paving blocks because the damage was caused by the incorporation of defective aggregate and concrete into the paving blocks, an "integrated system."[9] The paving blocks were an "integrated system" because the components of the paving blocks were integrated into a finished product and could not be separated from the finished product.[10]

¶108 The majority opinion in the instant insurance case states that the "integrated system" analysis in <u>Wausau Tile</u>, a tort liability case, "is necessary when evaluating coverage under a CGL policy because we must decide whether the product is to be treated as a unified whole or whether a defective component can be separated out such that the claimed damage

---

[8] <u>Wausau Tile, Inc. v. Cnty. Concrete Corp.</u>, 226 Wis. 2d 235, 247, 593 N.W.2d 445 (1999) (citations omitted) (emphasis added). In other words, if a defective component of an integrated system causes damage to that system, that damage is not compensable in tort. <u>Wausau Tile</u>, 226 Wis. 2d at 249 ("Damage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' which precludes the application of the economic loss doctrine.") (citations omitted).

[9] <u>Wausau Tile</u>, 226 Wis. 2d at 249-253.

[10] <u>Wausau Tile</u>, 226 Wis. 2d at 251.

6

constitutes damage to property other than the defective component itself."[11]

¶109 Applying an "integrated system" analysis, the majority opinion concludes that the tablets were an "integrated system" because the wrong probiotic bacteria, like the defective aggregate in Wausau Tile, was integrated into a finished product and could not be separated out after integration.[12] As a result, the majority opinion concludes that there was no "property damage" in the instant case.[13]

¶110 The majority opinion, however, ignores a critical distinction between Wausau Tile and the instant case.

¶111 Wausau Tile was a tort liability case applying the economic loss doctrine. It was not an insurance coverage dispute. Although an insurance policy in Wausau Tile covered "property damage" arising from an "occurrence," the Wausau Tile court was not addressing insurance issues; it did not decide whether the insurance policy in Wausau Tile provided coverage.[14]

¶112 The majority opinion treats Wausau Tile as an insurance policy case and reads the economic loss doctrine into the interpretation of insurance policy language. Wausau Tile

---

[11] Majority op., ¶28.

[12] See majority op., ¶¶34-35.

[13] See majority op., ¶35.

[14] Wausau Tile, 226 Wis. 2d at 268 n.19 ("[I]t is not necessary for us to decide precisely which property damage is covered under the policy . . . .").

does not compel the majority opinion's unwise and unprecedented approach.

¶113 Under the majority opinion's approach, the first step in evaluating a claim for "property damage" arising from an "occurrence" (at least when the "property damage" is caused by a defective product or component) is an "integrated system" analysis, not an interpretation of the language of the policies.

¶114 By conducting an "integrated system" analysis first, without regard to the underlying policy language, the majority opinion undercuts precedent. This court has held that the language of the policy, not the economic loss doctrine, determines insurance coverage.[15]

¶115 For example, in American Family Mutual Insurance Co. v. American Girl, Inc., 2004 WI 2, ¶¶6, 35-36, 268 Wis. 2d 16, 673 N.W.2d 65, this court held that even if "the economic loss doctrine may indeed [have] preclude[d] tort recovery," the economic loss doctrine "does not determine whether an insurance policy covers a claim, which depends instead upon the policy language."[16]

¶116 The majority opinion acknowledges our holding in American Girl and states that "the economic loss doctrine does

---

[15] Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶¶6, 35, 268 Wis. 2d 16, 673 N.W.2d 65.

[16] This court reaffirmed American Girl's approach in 1325 N. Van Buren, LLC v. T-3 Grp., Ltd., 2006 WI 94, ¶59, 293 Wis. 2d 410, 716 N.W.2d 822, noting that "although the economic loss doctrine may limit a party to contract rather than tort remedies, it does not determine insurance coverage."

not control a coverage dispute."[17] Nonetheless, the majority opinion concludes that "the court of appeals did not perceive the importance of an integrated system analysis when deciding whether claimed damage arose from physical injury to tangible property other than to the LA."[18]

¶117 But how can an "integrated system" analysis be important to resolving whether there was "property damage" caused by an "occurrence" under insurance policies when the insurance policies define these words and do not invoke the economic loss doctrine or integrated system rule?

¶118 The majority opinion concludes that the importance of the "integrated system" analysis stems not from the language of the insurance policies, but from the risks intended to be insured by a CGL policy.[19] Unlike a performance bond, which insures against the risk another party to a contract will fail to perform their obligations, the majority opinion states that a CGL policy is intended to insure against "'the risk that the insured's goods, products, or work will cause bodily injury or damage to property other than the product or the completed work of the insured.'"[20]

---

[17] Majority op., ¶32.

[18] Majority op., ¶32.

[19] Majority op., ¶¶25-26 & n.8.

[20] Majority op., ¶26 (quoting Vogel v. Russo, 2000 WI 85, ¶17, 236 Wis. 2d 504, 613 N.W.2d 177, abrogated in part on other grounds by Ins. Co. of N. Am. v. Cease Elec., Inc., 2004 WI 139, ¶25 n.6, 276 Wis. 2d 361, 688 N.W.2d 462).

¶119 I agree, however, with Professor Ellen S. Pryor's rejection of this argument in her article entitled The Economic Loss Rule and Liability Insurance, 48 Ariz. L. Rev. 905 (2006). As Professor Pryor points out, insurers have done a "poor job of implementing the economic loss rule through general insuring language," and the general language of CGL policies "poorly expresses" the differences between CGL policies and performance bonds.[21]

¶120 In short, the majority opinion ignores the language of the insurance policies, our accepted rules of interpreting insurance policies, and Wisconsin precedent.

II

---

[21] See Ellen S. Pryor, The Economic Loss Rule and Liability Insurance, 48 Ariz. L. Rev. 905, 906, 920 (2006).

The application of the economic loss doctrine to insurance policies is a developing issue. See, e.g., Ralph C. Anzivino, The Economic Loss Doctrine: Distinguishing Economic Loss from Non-Economic Loss, 91 Marq. L. Rev. 1081, 1116 (2008) (arguing for adopting the integrated system rule in insurance policy interpretation).

See also Restatement (Third) of Torts: Liability for Economic Harm § 6 cmt. c (Tentative Draft No. 2, 2014) (stating that "[n]o tort liability is recognized when a product fails to perform or causes damage to itself in a manner that produces pure economic loss," but implying that individuals may insure against such losses).

For issues involving liability insurance, see the American Law Institute's current project on a Restatement of Liability Insurance. As far as I can determine, the distributed discussion drafts on this project do not address the economic loss doctrine, but other drafts might.

¶121 I turn now to the text of the insurance policies——"property damage," "occurrence," and exclusions——without importing elements of the economic loss doctrine.

¶122 The majority opinion acknowledges that in interpreting an insurance policy, "[t]he reasonable expectations of coverage of an insured should be furthered by the interpretation given." Frost ex rel. Anderson v. Whitbeck, 2002 WI 129, ¶20, 257 Wis. 2d 80, 654 N.W.2d 225. The majority opinion never applies this rule. Wouldn't an objectively reasonable insured conclude it had insurance coverage in the instant case?

¶123 I agree with the court of appeals' interpretation of the insurance policies, and, like the court of appeals, I would hold that coverage exists.

¶124 Both insurance policies extend coverage for "property damage" caused by an "occurrence."[22] "Property damage" and "occurrence" are commonly used terms in commercial general liability policies, and the insurance policies contain similar definitions for both terms. As I noted above, neither definition refers to "other property" or incorporates the economic loss doctrine.

¶125 I agree with the court of appeals' decision that "[a] product is physically injured by the incorporation of a

---

[22] Majority op., ¶¶23, 57.

11

defective, faulty, or inadequate part that renders the other components or the whole unusable."[23]

¶126 In the instant case, by incorporating the wrong probiotic ingredient, the tablets were physically altered in a material way——the correct ingredients were intermingled with the wrong probiotic——and that alteration rendered the tablets, other ingredients and all, unusable.[24]

¶127 This court has not addressed whether the incorporation of a defective, faulty, or inadequate part that renders the whole unusable constitutes "property damage." Decisions from other jurisdictions are instructive.[25] The court of appeals correctly turns to cases from other jurisdictions to support its conclusion.

¶128 For example, the court of appeals cited National Union Fire Insurance Co. of Pittsburgh v. Terra Industries, Inc., 346 F.3d 1160 (8th Cir. 2003), and Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc., 78 Cal. App. 4th 847, 865 (Ct. App. 2000).

---

[23] Wis. Pharmacal Co. LLC v. Neb. Cultures of Cal., Inc., 2014 WI App 111, ¶20, 358 Wis. 2d 673, 856 N.W.2d 505 (emphasis omitted).

[24] "Physical injury to tangible property" refers to "'some sort of physical damage' to property, such as 'an alteration in appearance, shape, color, or in other material dimension.'" Gen. Cas. Co. of Wis. v. Rainbow Insulators, Inc., No. 2010AP347, unpublished slip op., ¶14 (Wis. Ct. App. Mar. 31, 2011) (quoting Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶31, 233 Wis. 2d 314, 607 N.W.2d 314; Travelers Ins. Co. v. Eljer Mfg., Inc., 757 N.E.2d 481, 502 (Ill. 2001)).

[25] See Wis. Pharmacal, 358 Wis. 2d 673, ¶20.

¶129 In National Union Fire, the federal Eighth Circuit Court of Appeals addressed whether, under Iowa law, the incorporation of adulterated carbon dioxide into carbonated beverages was "property damage" caused by an "occurrence." The federal court, relying on cases involving other adulterated products, concluded that "the incorporation of contaminated carbon dioxide into consumer beverages constitutes an 'occurrence' resulting in 'property damage' . . . ."[26]

¶130 Similarly, in Shade Foods, the California Court of Appeal concluded that the incorporation of almonds containing wood splinters into nut clusters for cereal was "physical injury to tangible property . . . ."[27] The Shade Foods court determined that "the presence of wood splinters in the diced roasted almonds caused property damage to the nut clusters and cereal products in which the almonds were incorporated."[28]

¶131 I am persuaded by the court of appeals' analysis of these and other cases that a product is physically injured "by the incorporation of a defective, faulty, or inadequate part that renders the other components or the whole unusable."[29]

---

[26] Nat'l Union Fire Ins. Co. v. Terra Indus., Inc., 346 F.3d 1160, 1165 (8th Cir. 2003) (collecting cases).

[27] Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc., 78 Cal. App. 4th 847, 865 (Ct. App. 2000).

[28] Shade Foods, 78 Cal. App. 4th at 866.

[29] Wis. Pharmacal, 358 Wis. 2d 673, ¶20 (emphasis omitted); see also Aetna Cas. & Sur. Co. v. M&S Indus., Inc., 827 P.2d 321, 326 (Wash. Ct. App. 1992); Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc., No. 5:00-CV-149-OC-10GRJ, 2002 WL 1433728, at *3 (M.D. Fla. Feb. 11, 2002).

¶132 I turn next to whether the physical injury in the instant case was caused by an "occurrence." I agree with the court of appeals and conclude that there was an "occurrence."

¶133 Both policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[30]

¶134 An "accident" is not defined in the policies, but this court has defined an "accident" within an insurance policy as "an event or condition occurring by chance or arising from unknown or remote causes."[31]

¶135 In Western Casualty & Surety Co. v. Budrus, 112 Wis. 2d 348, 352-53, 332 N.W.2d 837 (Ct. App. 1983), the court of appeals held that there was an "occurrence" within the meaning of a CGL policy when a party negligently sold incorrectly tagged seed to another. The court of appeals concluded that "the negligent act of selling the mistagged seed, which caused the damage" was an "occurrence" within the meaning of the policy.

¶136 I agree with the court of appeals in the instant case that, like providing the wrong seed in Budrus, providing the wrong probiotic bacteria was an "occurrence."[32]

---

[30] Majority op., ¶¶51, 69.

[31] Am. Girl, 268 Wis. 2d 16, ¶37 (quoting Webster's Third New International Dictionary of the English Language 11 (2002)).

[32] Wis. Pharmacal, 358 Wis. 2d 673, ¶26.

14

¶137 The majority opinion concludes that under California law "Jeneil's provision of a defective ingredient may have been occasioned by negligence; however, Jeneil deliberately supplied the ingredient to Nebraska Cultures, which, in turn, supplied the ingredient to Nutritional Manufacturing. Moreover, Jeneil intended the ingredient to be incorporated into the tablets. Given the deliberate nature of these actions, the provision of a defective ingredient cannot be said to constitute an 'occurrence' under California law."[33]

¶138 The majority opinion is obviously erroneous in this respect. An insured's intentional conduct that results in unintended consequences can be an "accident" under an insurance policy. As Professor Pryor explains, "[i]f the insured intended the act that caused the injury, is this enough to take the claim outside the definition of accident? The answer is universally, and properly, no. To read the definition of accident so narrowly would exclude all but inadvertent acts, and would exclude much of the realm of negligent acts causing personal injury."[34]

¶139 Finally, the majority concludes that the policies' exclusions for "impaired property" negate coverage.[35]

¶140 Jeneil's policy excludes coverage for "'[p]roperty damage' to 'impaired property' or property that has not been

---

[33] Majority op., ¶73.

[34] Pryor, _supra_ note 21, at 915-16.

[35] Majority op., ¶77.

15

physically injured, arising out of," among other things, deficiencies in "your product" or "your work" or the failure to perform a contract.[36]

¶141 "Impaired property" is defined in Jeneil's policy (with emphasis added) as follows:

> 8. "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or less useful because:
>
> > a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> >
> > b. You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
>
> > a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
> >
> > b. Your fulfilling the terms of the contract or agreement.

¶142 The majority opinion's conclusion that this exclusion negates coverage rests on its erroneous conclusion (based on its application of the integrated system rule derived from the tort economic loss doctrine) that there was no physical injury to tangible property in the instant case.[37]

¶143 I agree, however, with the court of appeals that this exclusion is inapplicable. "A product is physically injured by

---

[36] Majority op., ¶78.

[37] Majority op., ¶80.

16

the incorporation of a defective, faulty, or inadequate part that renders the other components or the whole unusable."[38]

\* \* \* \*

¶144 I disagree with the majority opinion's unwise and unprecedented application of the "integrated system" analysis derived from the tort economic loss doctrine to an interpretation of insurance policies. The (often incoherent) "Blob" of the economic loss doctrine should not be read into insurance policy interpretation. Instead, the court should follow its prior decisions holding that "[t]he [economic loss] doctrine does not determine insurance coverage, which turns on the policy language." Am. Girl, 268 Wis. 2d 16, ¶6.

¶145 Because I conclude, as did the court of appeals, after analyzing the policy language without importing principles from the economic loss doctrine, that there was "property damage" caused by an "occurrence" in the instant case and that none of the policies' exclusions negates coverage, I would affirm the decision of the court of appeals.

¶146 Finally, I add an additional note about the majority opinion.

¶147 The majority opinion states that "ANNETTE KINGSLAND ZIEGLER, J. and REBECCA G. BRADLEY, J., did not participate." Justice Annette Kingsland Ziegler advised the parties and the justices of this court that she withdrew from further

---

[38] Wis. Pharmacal, 358 Wis. 2d 673, ¶20.

No.  2013AP613 & 2013AP687.ssa

participation.[39]  Recusal of a justice is a significant issue for the parties and this court.  Why does the majority opinion not state that Justice Ziegler withdrew from further participation?

¶148 For the reasons set forth, I dissent and write separately.

¶149 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[39] See September 21, 2015 Letter from Justice Annette K. Ziegler to the parties and the justices filed in the correspondence file of the instant case maintained by the Clerk of the Supreme Court:  "I am writing to advise you of my decision to withdraw from further participation in this case."